[No. 13226.  Department One.  October 21, 1916.]

# M. H. EGGLESTON et al., Appellants, v. ALEX PANTAGES et al., Respondents.[1]

CORPORATIONS — STOCK—ISSUANCE—PAYMENT—FRAUD—EVIDENCE—SUFFICIENCY.  Subsequent stockholders cannot claim fraud in that a promoter of a theater company did not pay for his stock and procured their subscriptions by misrepresenting the cost of the theater building at $75,000, when in fact it cost but $36,379, where the promoter's stock was paid for by the completion of the building and the good will and booking privileges of his theatrical circuit, which was an asset of great value and earned a dividend of 136 per cent on all the capital stock within three years; and all the stockholders had, for six years, full opportunity to learn how the stock was paid for and did not claim to have relied on the representation as to the cost of the building; since their stock was worth at least all they paid for it.

EVIDENCE—PAROL TO VARY WRITING.  An unambiguous written contract to purchase stock in a corporation in consideration of the completion of a theater building upon certain plans and specifications, cannot be varied by parol evidence to the effect that the cost of the building was represented to be $75,000, and in fact was only $36,379.

CORPORATION — INSOLVENCY — RECEIVERSHIP AND SALE — FRAUD — LACHES.  Stockholders of an insolvent corporation who had notice of receivership proceedings that culminated in a creditor's sale, but made no appearance, are estopped by laches to claim fraudulent concealment as to the conditions, where they allowed the purchasing stockholder to meet all the losses for about three years, and only alleged fraud in the receivership and sale after the business began to show a profit.

Appeal from a judgment of the superior court for Spokane county, Huneke, J., entered January 12, 1915, dismissing an action for an accounting, tried to the court.  Affirmed.

*Merritt, Oswald, Lantry & Merritt*, for appellants.

*Cannon & Ferris* and *Ryan & Desmond*, for respondents.

ELLIS, J.—This is an action for an accounting grounded upon alleged fraud.

[1]Reported in 160 Pac. 425.

For several years prior to 1907, defendants Alex Pantages, Lois A. Pantages, his wife, and Elvira Mendenhall, his mother-in-law, were, and still are, the only stockholders in defendant corporation, Pantages Theater Company. That corporation has been, and still is, operating in various cities throughout the Pacific Northwest a circuit of theaters known as the Pantages theaters. It had, and has, well established connections, called in the record franchises and booking privileges, throughout the United States and Europe, to enable it to supply a continuous succession of attractions at its various houses. Spokane was not upon the Pantages circuit. Defendant E. Clark Walker, a resident of Spokane, had long been a friend of Alex Pantages and suggested the idea of including that city in the circuit. This was desirable in order to shorten the jumps of the different attractions from one house to another and thus reduce transportation charges. The plan was finally consummated by the organization of a separate corporation, the Pantages Amusement Company, with a capital stock of $75,000, in seven hundred and fifty shares of a par value of $100 each, to operate a theater in Spokane in connection with the Pantages circuit. The stock of this corporation was, on May 24, 1907, subscribed as follows: Alex Pantages, one share; M. H. Eggleston, one share; E. C. Walker, one share; Melvin G. Winstock, one share; Lois A. Pantages, one share, and Elvira Mendenhall, seven hundred and forty-five shares.

It seems to be admitted that these seven hundred and forty-five shares were in fact subscribed for Alex Pantages, who claims to have paid for this stock by furnishing the theater building and turning over to the Pantages Amusement Company the use of his name and good will and the franchises and booking rights of the Pantages Theater circuit. On the same day, a meeting of these stockholders was held, by-laws were adopted, and Alex Pantages, M. H. Eggleston, E. C. Walker, Lois A. Pantages and Melvin G. Winstock were

elected and qualified as trustees. These trustees at once met and elected officers as follows: Alex Pantages, president, M. H. Eggleston, vice-president; Lois A. Pantages, secretary, and E. C. Walker, treasurer. These trustees and officers were reelected at the next and succeeding annual meetings of the stockholders and trustees and held these respective offices throughout the active life of the corporation. Through Walker, plaintiffs and several other residents of Spokane became interested in the corporation, and on June 15, 1907, agreed to purchase $25,000 of its stock by a written contract of that date, which, so far as here material, was as follows:

"That whereas, the Pantages Amusement Company has been incorporated with a capital stock of $75,000 under the laws of the state of Washington, for the purpose of conducting a general theatrical business.

"Whereas, the said Alex Pantages, and his appointees, have practically subscribed for the entire issue of stock, and

"Whereas, it is desired that.........of Spokane, Washington, shall purchase at par $25,000 worth of stock in said corporation,

"Now, therefore, it is agreed, that said $25,000 worth of stock shall be paid for as follows:

"Fifty per cent upon the signing of these presents; 25 per cent on August 1, 1907; and the further 25 per cent when the Spokane Theater shall be fully completed and ready for occupation and use, as and for a theater, at which time, to wit, upon the final payment for said stock, the certificates for the same shall be duly issued to the respective parties hereto, in the amounts to which they are entitled.

"In consideration of the above, the party of the first part, the said Alex Pantages, agrees to alter the said Holley, Mason, Marks building, located in the city of Spokane, on Howard street, between Riverside avenue and Main avenue, into a completely equipped up to date theater, ready and in all respects in a workmanlike manner, fitted, furnished, lighted, heated, in accordance with plans and specifications furnished and prepared by architects Cutter & Malmgren, and to complete the said theater and turn it over to the Pantages Amusement Company at as early a date as is possible.

"And the said Alex Pantages further agrees to pay all rents and charges individually until such time as he turns over to said corporation, the said theater as aforesaid.

"In witness whereof, the said parties hereunto have affixed their hands and seals the day and year first above written.

| | |
|---|---|
| "Alex Pantages | Walter Keller |
| "I. Van Winkle | M. H. Eggleston |
| "Thomas T. Thomson | E. C. Walker |
| "F. J. Lorenz | Alex Nelson |
| | "Robert Keller." |

Pursuant to this contract, Eggleston purchased fifty shares, Thomson twenty-five shares, Rodenbach fifty shares, Walker fifty shares, and the other parties to the contract an aggregate of one hundred and twenty-five shares, making in all three hundred shares of a par value of $30,000. All of this stock was taken and paid for at par in money, as provided in the contract. For his services in securing this contract and in superintending the remodeling and equipment of the building, Walker received from Pantages fifty additional shares.

The building had already been leased by Pantages Theater Company from its owners for a period of fifteen years from April 1, 1907, at a monthly rental of $1,000, payable each month in advance. The lease provided that the building should be fitted for a theater at the expense of the theater company, in accordance with specifications prepared by certain architects; that the alterations and fixtures should become a part of the freehold and, on termination of the lease, should pass to the owners of the premises; that the theater company should pay all taxes and assessments against the premises for the full term, and furnish insurance against fire and accident in an aggregate of $72,000; and that a failure in any of these particulars, at the option of the owners of the premises, should work a forfeiture of the lease.

The building was remodeled and equipped, and on January 22, 1908, the premises were turned over by the Pantages Theater Company to the Pantages Amusement Company un-

der a sublease for a period of fourteen years at the same rental of $1,000 a month, and containing substantially the same provisions as the original lease. From that time for about three years, the theater was operated in connection with the Pantages circuit at great profit, paying dividends amounting to one hundred and thirty-six per cent of the entire capital stock of the Pantages Amusement Company. Business then fell off and a loss developed. The stock was nonassessable, but the stockholders all voluntarily paid back five per cent of the face of their stock to meet expenses. The loss continued and Pantages, Eggleston, Rodenbach, and possibly one other stockholder, paid another five per cent on their stock, the other stockholders refusing to pay anything further. The loss continuing, all save Pantages refused to make any further payments, and he alone continued to advance money to meet expenses.

In December, 1911, Eggleston brought an action for the appointment of a receiver, alleging that the corporation was deeply in debt and insolvent and was being mismanaged by Pantages in the interest of the Pantages Theater Company. This action was dismissed in consideration of Pantages agreeing in writing to pay Eggleston $2,189. Eggleston thereupon reported by letter to the other stockholders to the effect that the business was being honestly managed and advising them to "stay with the ship" in the hope of better times or a sale of their stock.

On March 21, 1912, Lois A. Pantages brought an action in the superior court of King county (that being the legal domicile of the corporation) against the Pantages Amusement Company on a number of its notes, some made to her personally, others to Pantages Theater Company and assigned to her, aggregating about $9,000, and asking for the appointment of a receiver to wind up the affairs of the company. Walker, as manager, accepted service and signed and filed an answer on behalf of the Pantages Amusement

Company, confessing the debt and consenting to the appointment of a receiver. The court entered judgment for $9,-712.51 and interest, and $250 attorney's fee, and appointed William Wray, an attorney of Seattle, as receiver. The receiver, after visiting Spokane and making certain investigations, reported that the business was being operated at a heavy loss; that the monthly rental of $1,000 was due and that the company had no means by which to pay it; that the lease was subject to forfeiture, which would carry with it all the fixtures and equipment; that the lease could not be sold at a profit and in fact was a liability rather than an asset, in that the premises could not then be rented for more than $750 a month; that there was only $400 cash on hand; that the company was indebted to Pantages Theater Company in the sum of $10,000, and to the Exchange National Bank of Spokane $5,000, as evidenced by demand promissory notes. The receiver recommended that an offer of Pantages Theater Company to take over the premises, including the fixtures and equipment, and relieve the amusement company from its liability on the lease be accepted. The report was approved and the transfer ordered. The transfer was accordingly made, the receiver made his final report thereof, which was by the court approved, and the receiver was discharged on April 23, 1912.

Thereafter the Pantages Theater Company continued to operate the theater as a part of its circuit, for a time at a continued loss, aggregating by August, 1913, approximately $13,000. Since that time the Spokane house has apparently shown a profit.

On March 18, 1914, plaintiffs brought this action. The charges of fraud are, in substance: (1) failure of Pantages to pay for his stock in the Pantages Amusement Company; (2) that Pantages and the other defendants conspired to procure the receiver, falsely representing that the corporation was insolvent; (3) that defendants suppressed the true facts and thereby caused the receiver to turn over to Pan-

tages Theater Company without adequate consideration the assets of the amusement company. It is alleged that Pantages is indebted to the corporation in the sum of $29,500 for stock not paid for by him, and in the sum of $37,170 received by him as dividends on this unpaid stock.

Defendants answered, denying all of the charges of fraud, and setting up as affirmative defenses: (1) the statute of limitations; (2) insolvency of the corporation when the receiver was appointed, full knowledge of plaintiffs of all the proceedings and of the appointment and doings of the receiver without objection by any of them; (3) the facts hereinbefore set out touching the organization of the amusement company, full knowledge of plaintiffs as to how the stock was subscribed and paid for, the contract with plaintiffs and others for the purchase of stock, defendants' performance of that contract, and pleaded laches on plaintiffs' part as an estoppel to the maintenance of this action. The reply traversed the affirmative matter in the answer. The cause was tried to the court without a jury. Judgment was entered dismissing the action with costs. Plaintiffs appeal.

The first and main charge of appellants is fraud on respondents' part in launching this corporation, in that Pantages paid no money for his stock. This is an action by stockholders who have been such since about two months after the stock was fully subscribed. No rights of creditors are involved. These appellants, at all times during the active life of the corporation, have had the right of full and complete access to the books of the corporation. One of them, at all times, has been vice president and trustee. There is no evidence that respondents, either by force, artifice or otherwise, have ever prevented appellants from acquiring the fullest knowledge as to how this stock was paid for. That the use of Pantages' name and good will and his franchises and booking privileges with the right to operate as a member of the Pantages circuit were assets of great value to the new theater cannot be seriously questioned. It is fairly apparent from

the evidence that, without these elements, the new venture as an independent theater would have had little chance of success. There is no evidence that they were not then in fact worth the sum for which Pantages claimed to have turned them over to this corporation. The very fact that, with no other assets save the lease of the theater premises and the building, the corporation for the first three years paid dividends amounting to one hundred thirty-six per cent on the entire capital stock at its par value is strong evidence of the value of these rights as an earning asset.

Appellants offered to prove that, in the negotiations leading up to the contract under which they purchased their stock, Pantages represented that it would cost $75,000 to remodel the building, that he would furnish the remainder of that sum above what they paid for their stock, and that there was no understanding that he was to have any stock for the use of his name or for anything else but cash. But the trial court was of the opinion, and so are we, that, in the face of their unambiguous written contract purchasing this stock, this evidence was inadmissible. That contract recites, as the only consideration for their purchase and payment for the stock in money, that Pantages would turn over to the company the theater building fully equipped according to certain specifications, and pay the rent until it was so turned over. It is not questioned that he has performed that agreement. It is elementary that all prior negotiations were merged in this writing. The fact that it cost him only $36,379 to meet this contract is immaterial. There was no offer of proof that appellants were induced to sign the contract and purchase the stock by the belief that the building would cost $75,000. Had the remodeling of the building actually cost $75,000, or even a greater sum and had Pantages failed to pay it, or had he paid for it from the earnings of the theater, a different question would be presented. There was no evidence, nor offer of evidence, that Pantages represented that he had paid cash for his stock. The doctrine that the capital stock of a

corporation is a trust fund for the creditors and that all stock must be paid for in money or money's worth (*Lantz v. Moeller*, 76 Wash. 429, 136 Pac. 687, 50 L. R. A., N. S., 68), in the absence of fraud or misrepresentation, has no application as between the stockholders themselves where the rights of creditors are not involved. *Inland Nursery and Floral Co. v. Rice*, 57 Wash. 67, 106 Pac. 499.

Even if it appeared that Pantages' name, good will, franchises and booking rights were not of the value at which he claims to have turned them over to this corporation in payment for his stock, the fact still remains that, during the whole business life of this corporation, these appellants, as stockholders, had every means of knowledge of what the building cost and what money or other assets the company possessed. Moreover, they were subsequent stockholders. They obtained full value in the purchase of their stock. The dividends which they received during the first three years furnish ample evidence of that fact. In such a case, where the rights of creditors are not involved, it is immaterial in what or how prior stockholders paid for their stock. *Inland Nursery and Floral Co. v. Rice, supra.* We are clear that appellants, at this late day, cannot be heard to say that they did not know that all of the stock was not paid for in cash, and cannot, in any event, claim injury through the purchase of stock which was then worth at least what they paid for it.

So far as this action rests upon the charges of fraud and conspiracy in the receivership proceedings and inadequacy of the consideration for the receiver's transfer of the assets to Pantages Theater Company, it seems plain that the defense of laches must be sustained. While the fact is disputed by one of the appellants, the evidence is convincing that all of the stockholders of Pantages Amusement Company were notified of the receivership proceedings, either at about the time of the application or soon after the transfer. Eggleston admitted that he had notice and soon afterwards investigated the proceedings and took the matter up with other stock-

holders. That the corporation was insolvent cannot be doubt-
ed. It had been running behind for months and Pantages
alone had been meeting the losses. As early as December,
1911, Eggleston had commenced proceedings alleging in-
solvency. Appellants, when the thing was done, had every
means of knowledge as to the manner in which the receiver
was appointed and as to the consideration for the transfer
that they now possess. Apparently, so long as the opera-
tion of the theater continued at a loss, they were content to
recognize the receiver's transfer as a valid transaction. Soon
after it began to show a profit, this action was begun. If, as
charged, the receivership was conceived in fraud and con-
spiracy and the transfer was approved by the court through
suppression of the facts, these things were as easily discover-
able then as now. Even as a direct attack to set aside the
transfer this action would be too late. *Wright v. Tacoma
Gas & Elec. Light Co.*, 53 Wash. 262, 101 Pac. 865; *Denny-
Renton Clay & Coal Co. v. Sartori*, 87 Wash. 545, 151 Pac.
1088. Viewed as an action for fraud, it is elementary that
such an action must be brought as soon as the party alleging
fraud is charged with knowledge of it.

A most careful consideration of the entire record has con-
vinced us that the trial court reached the correct result.

The judgment is affirmed.

MORRIS, C. J., MOUNT, FULLERTON, and PARKER, JJ., con-
cur.