[No. 29694. Department One. April 11, 1946.]

R. T. Davis, Jr., et al., *Appellants,* v. C. L. Harrison *et al.,*
*Respondents.*[1]

[1]Reported in 167 P. (2d) 1015.

*DuPuis & Ferguson* and *Geo. D. Lantz*, for appellants.

*Edward M. Hay* and *David O. Hamlin*, for respondents.

SIMPSON, J.—Plaintiffs, as stockholders of Alaska Pacific Mines, Inc., and its successor, Alaska Pacific Consolidated Mining Co., instituted this action for the purpose of securing an accounting of certain transactions between defendant C. L. Harrison and the above-named corporation, Alaska Pacific Mines, Inc.; that all shares of stock in the corporations held by the individual defendants be adjudged to be the property of Alaska Pacific Consolidated Mining Co.; and for a judgment against the individual defendants for the value of stock irregularly secured by them, together with a money judgment for sums alleged to have been wrongfully obtained.

The complaint, among other things, alleged that plaintiff Davis was and had been a stockholder in Alaska Pacific Mines, Inc., since February 25, 1936, and in Alaska Pacific Consolidated Mining Co., since its merger with Alaska Pacific Mines, Inc., on January 26, 1938; that plaintiff Naramore was and had been a stockholder in Alaska Pacific Mines, Inc., and its successor, since January 26, 1938; that C. L. Harrison from the date of incorporation of Alaska Pacific Mines, Inc., to the date of its merger with Alaska Pacific Consolidated Mining Co., was a director and president of the first-mentioned corporation, and thereafter was president of the Alaska Pacific Consolidated Mining Co. until September, 1943.

It was further alleged that Madeliene M. Harrison, wife of C. L. Harrison, was the holder of 101,500 shares of the Alaska Pacific Consolidated Mining Co. and received the

stock from C. L. Harrison without consideration. It was further alleged that Clay C. Harrison and W. R. Harrison, sons of C. L. Harrison, owned respectively 37,165 and 39,500 shares of stock in the Alaska Pacific Consolidated Mining Co., without having paid any consideration therefor.

It was also alleged that C. L. Harrison was in sole charge of the company's issuance of stock certificates, the keeping of the books of the company, and the management of the office of the company in Seattle; that, in addition thereto, he dominated the board of directors, consisting of himself and two other persons; that, during most of the period from the date of incorporation of the first-named corporation, the secretary of the company was in Alaska, and C. L. Harrison induced him to leave blank certificates of stock, and that the secretary's signature affixed to certain stock, was at all times in the possession of C. L. Harrison. Another allegation was that defendant C. L. Harrison wrongfully and unlawfully made and executed blank certificates to himself without consideration; that the dates on which the shares were issued, the stock certificate numbers, and the number of shares are as follows:

| Date | No. of Cert. | No. of Shares |
|------|------|------|
| March 4, 1936 | 154 | 35,000 |
| Aug. 21, 1936 | 252 | 15,000 |
| Aug. 21, 1936 | 253 | 2,500 |
| May 5, 1937 | 363 | 20,316 |
| Dec. 16, 1937 | 494 | 655 |
| Dec. 22, 1937 | 517 | 2,000 |

An additional allegation was to the effect that C. L. Harrison, during the year 1937, as an individual, borrowed money from August Buschmann and issued fifty-five thousand shares of stock to Buschmann as security.

The individual defendants answered the complaint by general denial and several affirmative defenses. The affirmative defenses alleged approval and confirmation by the corporations of all the acts of C. L. Harrison; that the action had not been commenced within the time limited by law; that the transactions mentioned in plaintiffs' complaint had, at all times, been fully disclosed by the books and records

of the companies and had been available to all shareholders for their inspection; further, that the shares of stock transferred to the defendants had been for a valuable consideration.

At the conclusion of the trial, the court entered its decree dismissing the action. Plaintiffs appealed. The assignment of error is worded as follows:

"The Court erred in rendering its oral decision against plaintiffs, in dismissing the action, in denying plaintiffs' motion for judgment notwithstanding the decision or for a new trial, and in entering its decree dismissing the action."

We shall for the most part refer to Alaska Pacific Consolidated Mining Co. as A. P. C. and to Alaska Pacific Mines, Inc., as A. P. M.

We deem it necessary to state at some length the facts relating to the two corporations and the activities of their officers. For many years prior to 1934, the date of the incorporation of A. P. M., respondent C. L. Harrison and George H. Thomas conducted business under an agreement whereby Thomas prospected claims and investigated mining properties which were of speculative value. Harrison purchased leases, options, and contracts on properties which were recommended by Thomas, with a view to selling or leasing them to other individuals who might desire to engage in mining operations. The working agreement made between Harrison and Thomas provided that the proceeds of the various ventures were to be equally divided, after Harrison had been reimbursed for his expenditures.

During the year 1934, W. W. Stoll was introduced into the enterprise and, in company with Harrison and Thomas, formed the corporation known as Alaska Pacific Mines, Inc. The total authorized capital stock of the corporation was five thousand dollars, divided into five hundred thousand shares of a par value of one cent each. In 1935, the capital stock was raised to ten thousand dollars, divided into one million shares.

Under an agreement made in 1934, Thomas continued his work in the field, and Stoll worked in the company office as secretary. Harrison received a one-half interest

in the enterprise and Thomas and Stoll a one-quarter interest each. Two hundred eighty-five thousand shares, less a qualifying share to each of the others, and one hundred fifty shares to Neva Appleton, were issued to C. L. Harrison. One half of the stock issued to Harrison was held in trust for Thomas and Stoll, who were at liberty to dispose of their portion as they desired. This procedure was adopted because of the insolvency of Thomas and Stoll. The consideration of the stock issued to Harrison which he owned individually was the transfer to the company of a leasehold of the Gold Cord Development Company.

In 1934, Thomas acquired several claims, among which was one in Alaska, known as the Gray Eagle. The claims in reality belonged to the corporation but were carried in the name of C. L. Harrison, because A. P. M. was not qualified to do business in Alaska. The following year, the directors agreed with J. M. McDonald, who represented a Canadian corporation, Bralorne Company, that McDonald should receive five per cent of the total outstanding stock of A. P. M. if he obtained the service of Bralorne Company to develop the Gray Eagle claim.

At a special meeting of the board of directors, held September 30, 1935, it was resolved that, in return for the transfer by C. L. Harrison of an undivided three-fourths interest in the Gray Eagle lode claim, there was to be issued to him thirty-five thousand shares of stock and payment in the sum of $1,450. It was orally agreed that thirty-five thousand shares should be set aside for the purpose of paying McDonald. The money was paid to Harrison for his expenses in acquiring the property. The thirty-five thousand shares were issued to C. L. Harrison March 4, 1936, by certificate 154, signed by Stoll. July 8, 1936, the Bralorne Company abandoned the project, and as a result none of the stock was issued to McDonald. In May, 1937, there was issued for Stoll's benefit 14,684 shares which came from certificate 154. The remainder was reissued to C. L. Harrison under certificate 363.

In 1936, it was decided that A. P. M. would engage in

mining operations. From that time until 1944, Stoll was the manager of the mine. The money to carry on the business was secured by C. L. Harrison in Seattle by various means, one of which was designated the 1936 gold loan. Under the provisions of that loan, each lender was to be repaid out of twenty per cent of the gold production of the mine and, as an inducement to loan the money, was permitted to buy five shares at one cent per share for every dollar loaned.

In July, 1936, Harrison raised six thousand dollars on a gold loan, half of which he advanced. The loan was not authorized by the directors, but August 21, 1936, certificates 252 and 253 for 17,500 shares were issued to Harrison, who paid therefor one cent per share. A like loan was made in 1937, which was approved by the board of directors. Certificate 494, dated December 16, 1937, to C. L. Harrison for 655 shares was issued by resolution of the directors as a carry-over from the 1936 gold loan of $218.75, which was credited to C. L. Harrison's account. Certificate 517 for two thousand shares, dated December 22, 1937, was issued to Harrison for accommodations he had made from his own stock to secure a loan from August Buschmann. This was done by resolution of the directors.

It appears that when Stoll went to Alaska in 1936, he executed in blank several stock certificates upon the request of C. L. Harrison, and that Harrison thereafter sent some of the certificates to Alaska, which Stoll signed and returned. Stoll testified that he was unaware that certificates 252 and 253 had been issued until he examined the books in 1942. The shareholders were informed of the issue in a circular letter which he sent to them in 1944.

February 18, 1935, August Buschmann endorsed a note of C. L. Harrison for three thousand dollars and received nine thousand shares which he thought belonged to Harrison. In August, 1936, he purchased twenty-five thousand shares for twenty-five dollars. May 5, 1937, he purchased another five thousand shares. In addition he received an option to exchange five thousand shares of Alaska Sunset stock for twenty-five thousand shares of A. P. M. and to

buy twenty-five thousand shares at twenty cents per share. He exercised these options. In 1937, he loaned C. L. Harrison and the company ten thousand dollars and purchased two thousand shares. The books of the corporation show that the five thousand shares of Alaska Sunset Company stock was carried as an asset until December 31, 1942, and was then charged off as worthless.

From the outset, the sale and accounting of stock was carried on in a haphazard fashion. E. J. Miner, a certified public accountant, was called upon to examine the books of A. P. M. in the summer of 1936. He stated that he could do nothing more than organize them for the bookkeeper. In 1937, he completed an audit and could find nothing illegal, although the financial account could not be harmonized. As far as he could find at that time, all the capital stock issues were authorized by the board of directors and were shown upon the books of the company. He determined that the net overissue of stocks was 5,989, of which Thomas received 3,679 and C. L. Harrison 1,810. However, Stoll testified that the overissues were inadvertences.

From the start, in 1934, C. L. Harrison carried a personal account in the books of the company, to which arrangement Thomas and Stoll apparently agreed, since Harrison financed the enterprise. Sums necessary to carry on the business were taken from this account, and moneys received were credited therein. At the time of the consolidation, the accounts of the three directors were brought into balance and transferred to A. P. C., and it was stated by Dan Hitchman, who examined the books in 1944, that there was no way of determining whether amounts coming from C. L. Harrison's account to Stoll and Thomas were to be repaid. In 1937, C. L. Harrison shipped to Alaska, for the use of the company, a generator, a B. B. hoist, and a Diesel engine, for which he credited himself with $1,975, and on a second shipment of miscellaneous wire, pipe, etc., credited his account for $1,455.25. There was some evidence introduced which showed that the property sent to Alaska was of very little value.

As of the date of trial, Clay Harrison had 32,165 shares.

He became treasurer of A. P. M. in 1935, and continued until 1938. In connection with the company, he worked sporadically for two and one-half years. From 1934 to the date of trial, Webb Harrison had received thirty-nine thousand shares. No cash was paid, but he took trips to Alaska for A. P. C. to survey their workings.

In September of 1937, the production of the Gray Eagle attained sizeable proportions, and, in order to avoid large tax payments for excess profits, it was decided that the Wasilla Mining Co. of Alaska should be formed for the purpose of transferring the Gray Eagle property from the books of A. P. M. Accordingly, the Wasilla Mining Co. secured a lease of the Willow Creek property, which included the Gray Eagle mine. This lease was approved by resolution of A. P. M. board of directors, September 22, 1937. A. P. C. was then incorporated and succeeded to all the interests of A. P. M. To the present date, A. P. M. has paid dividends of eight cents a share and A. P. C., ninety-three cents per share. There are now 969,378 shares outstanding in A. P. C.

From July, 1935, to June, 1944, Ruth Hannah Downing was bookkeeper. She testified that Stoll and Harrison helped her and that Stoll gave most of the directions, since C. L. Harrison didn't have much knowledge of bookkeeping. In February and March of 1944, W. W. Stoll issued circular letters to the stockholders, alleging that there were discrepancies in the account of C. L. Harrison. As a consequence of these letters, appellants and Stoll visited the offices of the company sometime after February 7, 1944, and examined the books. They found what they considered were irregularities, and called the matter to the attention of the board of directors of A. P. C. by letter dated April 3, 1944. The letter was read at a meeting of the board April 17, 1944, and a resolution was proposed by Stoll calling for legal steps to be taken for an accounting. The proposal failed to carry, and, instead, it was resolved that three individuals be appointed as a committee to make an investigation. Appellants, however, did not feel that the committee was competent and, thereafter, instituted this

action on May 2, 1944. Mr. Hitchman was employed by the committee to audit the books in April, 1944, and the report was adopted by the directors in December, 1944.

R. T. Davis, one of appellants, entered into a stock subscription contract with A. P. M. November 29, 1935, for the purchase of four thousand shares of stock. At that time, he paid two hundred dollars in cash, and the balance was paid two hundred dollars, January 18, 1936, two hundred dollars, February 12, 1936, and two hundred dollars, March 14, 1936. The certificate was issued March 16, 1936. At the time of the commencement of this action, he owned 21,898 shares.

Floyd A. Naramore, the other appellant, first acquired stock in May, 1938, and owned at the commencement of the action, ten thousand shares.

It should be borne in mind that the date of the last wrongdoing charged to the individual defendants was December 22, 1937; that Davis owned an interest in the stock prior to the date just mentioned; and that Naramore purchased his stock after the alleged wrongful acts had been committed.

It has always been the duty and right of corporations to bring actions to remedy wrongs imposed upon the corporation. However, until a comparatively short time ago, as we count time in legal history, it became apparent that in many cases the corporation was helpless and unable to institute the action. It was frequently found that the guilty parties themselves controlled the directors, also a majority of the stock, and the corporation was in their power; with the result that the minority stockholders were being defrauded of their rights and were without any remedy. The time came when the minority stockholders of the defrauded corporation—the corporation itself being controlled by the guilty parties—were accorded a position in court for the purpose of taking up the cause of a corporation and, in its name and stead, of instituting suits to remedy the evils and bringing the wrongdoers to justice.

In 1843, in the leading English case of *Foss v. Harbottle,* 2 Hare 461, a shareholder instituted action, on his own behalf and that of other defrauded stockholders, and for the

benefit of the corporation, against the directors for breach of a duty they owed the corporation. Judgment went against the plaintiff, on the ground that he had failed to prove that the corporation was controlled by the guilty parties and, further, that he was unable to bring the action. The court, however, in deciding the case, intimated that a case might arise where a suit instituted by defrauded stockholders would be entertained by the court and redress given. In view of the suggestion made, many defrauded shareholders instituted suits and urged courts of equity to grant them relief. Their efforts were unsuccessful in establishing the right of minority stockholders to recover in the name of the corporation until the announcement of the decisions in *Atwool v. Merryweather* (L. R., 5 Eq., 464, note), and *Dodge v. Woolsey*, 18 How. (59 U. S.) 331, 15 L. Ed. 401.

These decisions established the law in England and America that, where the directors of corporations breached their trust either by their frauds, *ultra vires* acts, or negligence, and the corporation was unwilling, or unable, to institute suit to remedy the wrong, a stockholder could bring action, on his behalf, and that of other shareholders, and for the benefit of the corporation, to recover for the corporation and indirectly for the stockholders.

It is clear that appellants, by reason of the fact that they owned stock in the corporation, had the right to institute this action on behalf of the corporation. However, the extent of such a right depends upon when, how, and for what purposes they acquired the shares which they own.

Two questions present themselves in this case: First, may a minority stockholder maintain a derivative action for fraudulent issue of stock by a former officer of the corporation, when it appears that the plaintiff stockholder acquired an interest in the corporation subsequent to the date of the alleged transaction; second, does the statute of limitations bar a minority stockholder's action for fraud, where it is shown that the transactions upon which fraud was predicated were spread upon the corporate books and were within the knowledge of the directors for a period in excess of three years.

■ As may be supposed in a country of many jurisdictions and diverse philosophies, the authorities are not in complete harmony on the first question. The divergent views, as expressed by the courts of this country, are cited in 13 Fletcher, Cyclopedia Corporations (Perm. ed.), §§ 5980, 5981. The views expressed in the following cases compel us to the view that a stockholder who purchases his stock after an alleged wrong has been committed by officers of a corporation cannot maintain a derivative action. An exception would apply only in cases in which the wrongful acts were effectually concealed, and it appeared that the effects of the mismanagement continued to the stockholder's injury.

*Inland Nursery & Floral Co. v. Rice,* 57 Wash. 67, 106 Pac. 499, was an action brought by a corporation to cancel stock issued to two of its original incorporators. Shortly after the corporation was organized, the directors of the company, which had no property, placed a large portion of the stock in the hands of one of the directors to be held in trust for promotional purposes. Half of the capitalization of the par value of fifty thousand dollars was exchanged for a nursery worth two thousand dollars, it being owned by two of the directors. It was held that in the absence of actual fraud the company could not treat the stock as unpaid. At the time of the transfer it had no property, and the stock was worth no more nor less than was paid for it. Subsequent stockholders received full value for the money which they paid, and the transaction was on the books and records of the company, which could have been inspected had they so desired. In passing this court stated:

"It is well established that a corporation issuing stock as fully paid by a transfer of property cannot thereafter treat it as partly paid; and upon the same reasoning it is held that, in the absence of actual fraud, a corporation cannot maintain an action to cancel shares of stock issued in exchange for property, upon the ground that the property was not actually worth the valuation placed upon it."

The case of *Gold Ridge Mining & Development Co. v. Rice,* 77 Wash. 384, 137 Pac. 1001, is another case having to do

with a newly organized corporation. In that case, it appears that defendant and another organized the company, became its first directors, and sold a bond on some mining property to it in exchange for two thirds of the stock. It was contended that the stock was not paid for. In deciding that the action could not be maintained, the court held:

"The rights of creditors are not involved. The appellant and Hammer were upon both sides of the bargain. The respondent was also represented by its third trustee. No one was wronged and no rule of public policy was violated. The holders of the bond knew what they were selling, and the respondent knew precisely what it was buying. The deal was made in the open, and the transaction was valid as between the parties."

The facts in *Eggleston v. Pantages,* 93 Wash. 221, 160 Pac. 425, reveal that the Pantages Amusement Company was incorporated, with the defendant as the principal subscriber to the stock, for the purpose of operating and financing a theater in Spokane. In a contract between Pantages, plaintiff Eggleston, and several other tentative subscribers, Pantages agreed to supply the theater in return for the purchase by them of twenty-five thousand dollars worth of stock. The theater was affiliated with the Pantages Circuit, and large dividends were paid. Later, it went into receivership and was taken over by the Pantages Circuit. The main contention was that Pantages did not pay for his stock. In holding that the action did not lie, this court said:

"Moreover, they were subsequent stockholders. They obtained full value in the purchase of their stock. The dividends which they received during the first three years furnish ample evidence of that fact. In such a case, where the rights of creditors are not involved, it is immaterial in what or how prior stockholders paid for their stock. *Inland Nursery and Floral Co. v. Rice, supra.* We are clear that appellants, at this late day, cannot be heard to say that they did not know that all of the stock was not paid for in cash, and cannot, in any event, claim injury through the purchase of stock which was then worth at least what they paid for it."

*Metcalfe v. Mental Science Industrial Ass'n,* 127 Wash. 50, 220 Pac. 1, was decided upon the pleadings. They were to

the effect that, in 1903, the defendant corporation was organized by M. J. Knox and others; that pursuant to a resolution of the board of directors, Knox received two hundred fifty thousand shares of stock in exchange for the periodical which he published, and that, subsequently, the stock was sold to other parties, including the plaintiff. Further, that, upon making inquiry as to the two hundred fifty thousand shares, Knox stated that it was for the purpose of promoting the enterprise and to raise one hundred thousand dollars. Since that was not strictly correct, the question presented was whether or not plaintiffs had a right of action, on the theory that Knox acquired the stock in fraud upon those who subsequently became stockholders. It was held that the transaction was approved by all parties, and was contained in a resolution of the board of directors; and that the plaintiffs, who were subsequent stockholders, were not wronged. This court in speaking of the stock had the following to say:

"It is a fair inference from the complaint that it was not of more value then than at the time the purchases were made by the appellants; but, even if it had a value greater than Knox paid for it, it nevertheless was not a fraud upon subsequent stockholders to issue the stock and take property in return therefor which was of less value than the par value of the stock."

*Colville Valley Coal Co. v. Rogers,* 123 Wash. 360, 212 Pac. 732, is very much in point in this case. The facts were that three incorporators, who were defendants, exchanged mining properties for stock soon after the incorporation, that action being in accordance with agreements reached in a meeting held prior to the formation of the company, and all original parties were aware of the transaction. The plaintiffs who brought the action on behalf of the corporation contended that, as the property was not of the value as represented, the stock had not been paid for. This court, in affirming the trial court's action in granting a motion for nonsuit, stated that:

"As to appellants who were subsequent stockholders, buying stock after the original distribution of stock to the or-

ganizers of the corporation, under the decision in *Inland Nursery & Floral Co. v. Rice, supra,* they cannot complain where it is not established that they did not have an opportunity to investigate the value of the property transferred to the corporation and did not obtain full value in the purchase of their stock; and it is immaterial that the promoters were trustees of the corporation and in issuing the stock to themselves in exchange for property were, in a measure, dealing with themselves. For all that appears, these subsequent stockholders, who have joined with plaintiffs in this action, bought in the open market when the stock of the company was selling far above par, and had every opportunity to investigate for themselves as to the value of the company's properties before buying."

In the case of *Hawes v. Oakland* [*Hawes v. Contra Costa Water Company, City of Oakland et al.*], 104 U. S. 450, 26 L. Ed. 827, the plaintiff, a shareholder in the Contra Costa Water Works Company, brought a bill in equity against the company and the city of Oakland in the circuit court of the United States for the district of California, on the ground that he was a citizen of New York, and the defendants citizens of California, alleging that the company was furnishing the city of Oakland with water free of charge beyond what the law required it to do, and that, although he had demanded that they desist, the directors had failed to heed his protest, and that, unless enjoined, they would continue to furnish water to the city in excess of their legal obligations, and to the damage of plaintiff and the other stockholders. The city of Oakland demurred to the complaint upon the ground that the appellant had failed to show capacity in himself to maintain the suit, the injury, if any, being to the corporation, and the right to sue pertaining to it solely. The demurrer was sustained and the suit dismissed.

The case was then appealed to the supreme court of the United States. The decision of the court, written by Mr. Justice Miller, maintained the view of the earlier decisions of the English and American courts as to the right of stockholders of corporations to maintain actions. In rendering the opinion, the court, after enumerating a number of circumstances in which the stockholder might be permitted

to sue upon a cause of action relating to the corporation, said:

"But, in addition to the existence of grievances which call for this kind of relief, it is equally important that before the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court. If time permits or has permitted, he must show, if he fails with the directors, that he has made an honest effort to obtain action by the stockholders as a body, in the matter of which he complains. And he must show a case, if this is not done, where it could not be done, or it was not reasonable to require it. "The efforts to induce such action as complainant desires on the part of the directors, and of the shareholders when that is necessary, and the cause of failure in these efforts should be stated with particularity, and an allegation that complainant was a shareholder at the time of the transactions of which he complains, or that his shares have devolved on him since by operation of law."

Shortly after the opinion in the above-entitled case was handed down, the Federal supreme court adopted an equity rule in substantially the same language as was used in that decision. The rule originally known as rule No. 94, later as rule No. 27, and now appearing as rule No. 23 (b), Federal Rules of Civil Procedure, 28 U.S.C.A. 524, following § 723c, 8 F.C.A. (1937 ed.) 719, title 28, app. 3, requires a stockholder, seeking to enforce a secondary right because the corporation refuses so to do, to charge, among other things,

". . . that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law." (For cases involving this rule see 148 A. L. R. 1091-1100.)

One of the leading decisions on this subject is *Home Fire Ins. Co. v. Barber,* 67 Neb. 644, 93 N. W. 1024. Defendant Barber was one of the corporators and, as general manager,

was largely in control of the corporation. Barber and other codefendants borrowed money from the bank to purchase shares from opposing stockholders, in an endeavor to secure and maintain control of the corporation. The bank loan was paid by borrowing from the company. In a rather lengthy, but well-reasoned opinion, Commissioner Pound reviewed the decisions with respect to the rights of subsequent stockholders and stated with considerable case authority that

" . . . sound reason and good authority sustain the rule that a purchaser of stock cannot complain of the prior acts and management of the corporation."

In *Jepson v. Peterson*, 10 N. W. (2d) (S. D.) 749, a minority stockholder as plaintiff sued on behalf of himself and all other stockholders similarly situated, but failed to plead that he was a stockholder at the time of the alleged mismanagement of the directors. It was held that he could not maintain the action, since there was no special injury to him. The court stated:

" 'Hence there is obvious reason for holding that one who held no stock at the time of the mismanagement ought not to be allowed to sue, unless the mismanagement or its effects continue and are injurious to him, or it affects him specially and peculiarly in some other manner.' "

Accord: 13 Fletcher, Cyclopedia Corporations (Perm. ed.) 352, § 5980 *et seq.*; 13 Am. Jur. 501, Corporations § 456, *Rankin v. Southwestern Brewery & Ice Co.*, 12 N. M. 54, 73 Pac. 614, *Eisler v. Eastern States Corp.*, 182 Md. 329, 35 A. (2d) 118, *News-Journal Corp. v. Gore*, 147 Fla. 217, 2 So. (2d) 741.

Appellants call our attention to many cases which hold that a subsequent stockholder may maintain an action for wrongful acts against his corporation. We have examined those cases with care, but do not feel inclined to depart from our holding already indicated. Appellants also argue that many of the cases opposed to their theory are based upon the United States equity rule. This argument cannot apply to the *Hawes* case, *supra*, for the reason that the decision in that case was announced more than a year before the rule

was promulgated, so that it can admit of no dispute that, in the opinion of the United States supreme court at least, the ownership of the stock at the time the transaction was complained of, was essential to the right to maintain such an action as a matter of substantive law, prior to and independent of the equity rule.

The rule just announced made it impossible for appellant Naramore to maintain his action, for the reason that he had purchased his stock several months after the date when the last wrong was alleged to have been committed by respondents. By the same token, Davis was barred from complaining about any misdeeds which had occurred prior to the time he purchased his stock.

■ Did the statute of limitations, Rem. Rev. Stat. (Sup.), § 159 [P.P.C. § 73-11] (4), bar appellants' action for the fraud or negligence of one of its officers in the issuance of stock to himself and sales of machinery to the corporation, where it appears (1) that the other members of the board of directors were not interested in the transactions and had actual knowledge of the alleged acts; (2) that the details of each transaction were ascertainable from the books and records of the corporation; and (3) that more than three years had elapsed since the occurrence of the questioned acts? The rule adopted by the majority cases, at least, is that, when the action would be barred by the statute of limitations when brought by a corporation itself, it is barred when instituted by a minority stockholder. The reason for the rule is that the minority stockholder shoulders the burden of the corporation because of its inability to maintain the action, and that the action is maintained for and on behalf of the corporation. This reasoning is supported by the following authorities:

In *Moore v. Los Lugos Gold Mines,* 172 Wash. 570, 21 P. (2d) 253, this court quoted with approval the following statement from 14 C. J. 938:

" 'In a suit by a stockholder on behalf of the corporation the real controversy is between the corporation and the person whose acts are complained of; the corporation is the beneficial plaintiff, even though it is joined as a party de-

fendant. The suit is for the benefit of the corporation and all the stockholders and not for plaintiff individually. It must be brought in equity; an action at law cannot be maintained.' "

In 13 Fletcher, Cyclopedia Corporations (Perm. ed.), § 5947, it is said:

"For the purpose of making out a cause of action in favor of the corporation, the stockholder stands in the corporation's shoes and must ground the suit on the corporation's rights and a wrong thereto. It follows that he cannot sue unless there is, at the time he brings suit, a cause of action which could be enforced by the corporation if it so desired."

In the same volume, § 5886, we find the following:

"Keeping in mind that a stockholders' suit is one in equity, and that a stockholder cannot sue for the corporation if there is no cause of action in favor of the corporation, the rule supported by reason is that if the cause of action belonging to the corporation, and which is sued on, is itself barred by the statute of limitations, the action by the stockholder as the representative of the corporation is also barred."

In *Holmes v. Jewett,* 55 Colo. 187, 134 Pac. 665, which is one of the leading cases on this subject, the stockholders' suit was brought to compel the return of property deeded to its former president and director. In speaking of the relationship of the plaintiff and the corporation, it is said:

"As a rule suits to enforce rights belonging to the corporation must be brought in its name and upon the action of the board of directors, and where a stockholder is permitted to bring such a suit, he acts for the corporation on the equitable ground that the officers who should have brought it in the name of the corporation refuse to act or are violating some trust reposed in them by the stockholders."

In *Wallace v. Lincoln Sav. Bank,* 89 Tenn. 630, 15 S. W. 448, 24 Am. St. 625, the facts showed that the cashier of defendant bank mismanaged, or wrongfully appropriated, funds, and, although the transactions were apparent on the books, the directors did not detect it. The action was brought by stockholders against the directors on behalf of the corporation. While holding that an election would lie,

it was held to be barred by the statute of limitations, the law being stated as follows:

"An action at law lies in favor of the corporation against directors for malfeasance, misfeasance or negligence in office, whereby loss or damage had resulted, and the limitation applicable to the suit of the corporation at law is equally applicable to the suit of the stockholder upon the corporate right of action in equity."

*Mencher v. Richards,* 256 App. Div. 280, 9 N. Y. S. (2d) 990, was a representative action brought by stockholders for gross mismanagement. The court stated:

"If a corporation is barred from recovering by the lapse of three years prior to institution of suit after its discovery of the facts, then this derivative action is likewise affected."

*Earl v. Lofquist,* 135 Cal. App. 373, 27 P. (2d) 416, was an action for the recovery of real property transferred from the corporation to the director and secretary in an alleged fraudulent manner. While it was said that a subsequent stockholder could maintain the action, it was held that the statute of limitations had operated against the corporation itself, and that that fact precluded recovery.

Regardless of the rule just stated, it is clear that the statute of limitations applied to the stockholders in their individual capacities and barred them from bringing an action. The statute of limitations was set in motion against the stockholders at the time the alleged wrongful or negligent acts were committed and the facts could be ascertained from the books of the company. *Deering v. Holcomb,* 26 Wash. 588, 67 Pac. 240, 561; *Noyes v. Parsons,* 104 Wash. 594, 177 Pac. 651; *Henriod v. Henriod,* 198 Wash. 519, 89 P. (2d) 222, and *Bay City Lbr. Co. v. Anderson,* 8 Wn. (2d) 191, 111 P. (2d) 771.

We call to mind and again approve the following pertinent statement in the first case cited:

"A party defrauded must be diligent in making inquiry. The means of knowledge are equivalent to knowledge. A clue to the fact, which, if followed up diligently would lead to a discovery, is in law equivalent to discovery,—equivalent to knowledge."

In the last case cited, this court clearly pointed out the time and manner in which corporation officials and stockholders must take notice of the actions of corporation officials. The facts in that case parallel in many respects those in the case at bar. The company was organized for the purpose of manufacturing lumber, and in conjunction therewith, sold scrap for fuel. S. M. Anderson, Sr., was president and general manager, and his son, S. M. Anderson, Jr., was assistant manager. They entered into an agreement executed in 1927 and running to 1929, for the selling of the fuel wood. The purchaser agreed to pay a fixed price, and in addition, Anderson, Jr., received a bonus for his services in procuring the agreement. The contracts were of considerable benefit to the mill, and the transactions were handled by the bookkeeper by two invoices, one to the company and one to Anderson, Jr. Although the checks which he received did not appear on the records which were accessible to stockholders, the contract and the letters referring to the transaction were contained in the files. However, there was no entry in the minute books showing approval by the trustees of the payment of the bonus.

Three families were interested in the company—the Anderson family, the Polson family, and A. W. Middleton. The Andersons operated the business, and the Polson interests only appeared at the annual meeting to collect dividends and elect officers. Anderson, Sr., fixed the salaries and paid the bonuses, and his actions were not questioned until the action was instituted in 1939. One of the Polsons was a member of the board of directors at all times, and, in 1935, F. A. Polson became president. In speaking of the secrecy of the bonus, this court said:

"It is impossible for us to believe, after carefully reading this record, that either S. M. Anderson, Sr., or S. M. Anderson, Jr., ever intended to cover up the way this deal was taken care of, or to keep it from the trustees of the corporation. The letters were all written by the bookkeeper, and copies kept at all times in the files; the checks were sent to the bookkeeper, and the Anderson check deposited by the timekeeper. The entire transaction was handled openly and aboveboard. In so far as this record shows, there were, in

the files of the company at all times for some twelve years, records from which it could have been determined that S. M. Anderson, Jr., received this money; at least, there were records which would have given a clue to the transaction. Whether any of the trustees did or did not examine the books and files of the company, does not appear; however, there was no reason shown why they could not have done so had they desired to."

This court assumed there, as we do here, that the action was based on fraud, and that the three year statute of limitations applied. It was pointed out that fraud, if any, occurred at the time of the receipt of the payments from 1927 to 1929. This court then stated:

"Unless the statute of limitations was tolled by affirmative proof that the corporation did not discover the alleged fraud until within three years next before the bringing of this action, a cause of action accrued against defendants on the date of each payment, and the statute of limitations would have run against a cause of action on the last payment made on February 6, 1929, three years thereafter. This action was not started until February 23, 1939."

We then made a further statement in the case:

"In conclusion, we desire to call attention to the case of *Henriod v. Henriod,* 198 Wash. 519, 89 P. (2d) 222, wherein we discussed subd. 4, § 159, Rem. Rev. Stat., citing many cases. We therein quoted from *Noyes v. Parsons,* 104 Wash. 594, 177 Pac. 651, as follows:

" ' "The broad assertion that the statute does not run until the fraud is discovered is not tenable. The statute begins to run when the fraud should have been discovered, and a clue to the fact which, if followed up diligently, would lead to discovery, is in law equivalent to discovery." [Citing cases.]'

"We refer to this case in view of the facts, which we have hereinbefore set out, relative to the condition of this record in regard to the files of the company. When these facts are considered together with the presumption that the trustees of a corporation know of the corporate acts, the conclusion, as we have said, is almost inescapable that the corporation did know of this transaction, during the time S. M. Anderson, Jr., was receiving the money, and if it did have such knowledge, the statute of limitations has long since run against this claim."

We hold that this action was barred by the three-year statute of limitations, whether appellants had actual knowledge of the various transactions or not, for the reason that the facts were open and appeared upon the records of the corporation, subject to inspection by the stockholders. If the stockholders failed to examine the corporate records, they must have been negligent and careless of their own interests. The means of knowledge were open to them, and means of knowledge are equivalent to actual knowledge.

For the reasons set out in this opinion, we affirm the judgment of the trial court.

DRIVER, C. J., MILLARD, STEINERT, and MALLERY, JJ., concur.