NANCY M. WENTZEL ET AL. *v.* MONTGOMERY
GENERAL HOSPITAL, INC. ET AL.

[No. 74, September Term, 1981.]

*Decided July 20, 1982.*

*Motion for reconsideration filed August 16, 1982; denied September 1, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Thomas L. Beight* for appellants.

*M. Michael Cramer,* with whom was *Benjamin A. Klopman* on the brief, for appellee, the minor child, and by

*Joseph V. Truhe, Jr.,* with whom were *Miller, Miller & Canby, Chartered,* on the brief, for appellee Montgomery General Hospital, Inc.

Murphy, C. J., delivered the opinion of the Court. Smith and Digges, JJ., concur in part and dissent in part. Davidson, J., dissents. Smith, J., filed an opinion at page 705 *infra,* concurring in part and dissenting in part. Digges, J., filed an opinion at page 718 *infra,* concurring in part and dissenting in part. Davidson, J., filed a dissenting opinion at page 718. *infra.*

This case presents the question whether a trial court of general jurisdiction is empowered to grant a guardian's petition to sterilize an incompetent minor through the performance of a subtotal hysterectomy.

I

The child who is the subject of this litigation, Sonya Star Flanary, is a severely retarded 13-year-old with an I.Q. of about 25 to 30 (the equivalent of a mental age of 1 to 2 years), blind and with pronounced neurological problems. Sonya was born a normal child. At the age of 5 months, she was severely injured in an automobile accident, suffering brain and other physical damage. After an initial paralysis, Sonya's physical condition greatly improved but her mental development was seriously retarded. Unable to cope with the event, Sonya's mother took her to live with her grandmother, Nancy Wentzel, who is now 61 years old. Sonya, her two sisters, and Gail Sheppard, Sonya's aunt, have been living with Mrs. Wentzel since shortly after the accident. This case began when Mrs. Wentzel and Gail Sheppard, who together provide Sonya's principal care, sought the performance of a hysterectomy upon Sonya, which would terminate her menstrual cycle and result in her sterilization. The medical staff of Montgomery General Hospital refused to perform the operation without a court order authorizing the procedure. Consequently, Mrs. Wentzel and Ms. Sheppard filed a petition in the Circuit

Court for Montgomery County, seeking appointment as Sonya's guardians with authority to consent to the proposed surgical procedure. The petition recited that Sonya "is currently in need of additional medical care (hysterectomy) and that the medical staff and petitioners request an Order of Court approving said medical procedure for therapeutic reasons."

Pursuant to Maryland Rule R76, the court appointed an attorney to represent Sonya and conducted an evidentiary hearing. The evidence disclosed that Sonya regularly attended a special school, although missing many sessions because of illness. It was established that Sonya had reached puberty and was experiencing pain connected with menstruation. It was shown that Sonya could not care for her most basic hygienic needs, that she would not wear sanitary napkins and was irritable and disoriented during the menstruation process. There was evidence showing that the guardianship petition was motivated by a sincere desire to free Sonya of the pain and other consequences suffered by her during menstruation and because of genuine concern that Sonya was an easy subject for rape and resulting pregnancy. Sonya's mother testified in support of the guardianship petition, stating that sterilization was in Sonya's best interest.

The petitioners produced testimony of a child psychiatrist who, although he had never treated Sonya and had only seen her twice, said that a subtotal hysterectomy would be in Sonya's best interest. The psychiatrist was unable to say, however, that such a procedure was necessary for Sonya's physical or mental health. On cross-examination, the witness admitted that Sonya would not be in any medical danger if the operation were not performed, and he also agreed that some pain and irritation connected with the menstrual cycle is normal. The psychiatrist agreed that no life threatening consequences would occur if Sonya were to have offspring and further that Sonya was perfectly capable of having a normal baby. The evidence disclosed that there was no reasonable expectation that Sonya's mental condition would improve.

It was argued that Maryland Code (1974, 1981 Cum. Supp.), § 13-708 of the Estates and Trusts Article empowered the court to grant the guardianship petition and to authorize the guardians to consent to the operation. Section 13-708, insofar as pertinent, provides:

"(a) The court may grant to a guardian of a person only those powers necessary to provide for the demonstrated need of the disabled person.

"(b) Subject to subsection (a) of this section, the rights, duties, and powers which the court may order include, but are not limited to:

(1) The same rights, powers, and duties that a parent has with respect to an unemancipated minor child . . . ;

(2) . . . .

(3) The duty to provide for care, comfort, and maintenance, including social, recreational, and friendship requirements, and, if appropriate, for training and education of the disabled person;

(4) . . . .

(5) . . . .

(6) If a guardian of the estate has been appointed, the duty to control the custody and care of the disabled person, . . .;

(7) . . . .

(8) The power to give necessary consent or approval for medical or other professional care, counsel, treatment, or service, except that the court must authorize any medical procedure that involves a substantial risk to life."

The trial judge (Bell, J.) found from the evidence that Sonya was totally lacking in capacity to consent to the operation; that "Sonya cannot care for herself, let alone a baby"; and that "Sonya's menstruation further burdens an already over-burdened family." The court noted the sincerity of the family's belief that the operation was in Sonya's best interest, and it also recognized the possibility that Sonya could

become pregnant if sexually abused. The court observed that the psychiatrist did not testify that the operation was necessary for Sonya's medical health or that refusal to authorize it would cause such a mental hardship as would justify the surgery for therapeutic reasons. The court concluded that § 13-708 of the Estates and Trusts Article "could not be interpreted to provide a hysterectomy in a case such as Sonya's." It noted that "the alternative to the hysterectomy is not life threatening." The court said:

> "In the absence of such statutory authority and guide lines, this Court cannot find that it has the authority to grant the relief sought."

The court appointed the petitioners as co-guardians of the person and property of Sonya but denied permission to consent to the hysterectomy. The guardians appealed to the Court of Special Appeals. We granted certiorari prior to decision by the intermediate appellate court to consider the profound issues raised in the case.

## II

The guardians claim that the lower court erroneously denied the petition on the ground that it was not empowered, absent express statutory authorization, to order sterilization unless for therapeutic reasons. They maintain that under § 13-708 of the Estates and Trusts Article the court, upon a showing of "demonstrated need," is authorized to approve the sterilization of a minor incompetent for nontherapeutic reasons. The guardians suggest that they have a duty under the statute to plan for the preservation and maintenance of the future well-being of their ward. The evidence in this case, they argue, substantiates the existence of a demonstrated need for the operation because Sonya is mentally and physically unable to care for her own physical needs due to her severe state of mental retardation. It is additionally argued that the medical evidence supports the conclusion that Sonya's sterilization "will preclude future negative trauma both physically and mentally, given the severity of

Sonya's mental retardation and her low functioning levels and eliminate the possibility of pregnancy."

The guardians contend that Code (1980 Repl. Vol.) § 1-501 of the Courts and Judicial Proceedings Article confers upon a circuit court full equity powers in civil cases — powers which are not limited by the provisions of § 13-708 of the Estates and Trusts Article. Sterilization would be in Sonya's best interests, the guardians say, because Sonya is unable to communicate effectively with others; to understand or handle her own bodily functions; to know the difference between sexes, much less the needs of a potential child; and to understand the menstrual cycle or pregnancy. Moreover, the guardians point out that they are presently 61 and 33 years old, respectively, and that Sonya's life expectancy far exceeds their own. In these circumstances, it is contended that it is in the best interests of Sonya and those who assume responsibility for her care, both in the present and in the future, that Sonya be sterilized. The guardians maintain that acting under the *parens patriae* doctrine, equity courts have traditionally exercised their powers in the best interests of incompetent minors, and that accordingly the lower court should have granted their petition in order to preserve Sonya's physical and mental well-being. It is emphasized that should Sonya have a child, both she and the child will become wards of the State, if her family cannot care for both. It is argued that this will place a financial burden on the State, and it therefore has a compelling interest justifying granting the guardians' petition authorizing the giving of consent to Sonya's sterilization.

## III

A number of jurisdictions hold that in the absence of express legislative authorization, courts are totally devoid of subject matter jurisdiction to consider petitions seeking sterilization of incompetent minors. *See, e.g., Hudson v. Hudson,* 373 So.2d 310 (Ala. 1979); *Guardianship of Tulley,* 83 Cal. App. 3d 698, 146 Cal. Rptr. 266 (1978), *cert. denied,* 440 U.S. 967, 99 S. Ct. 1519, 59 L. Ed. 2d 783 (1979); *Matter*

*of S.C.E.,* 378 A.2d 144 (Del. Ch. 1977); *A.L. v. G.R.H.,* 163 Ind. App. 636, 325 N.E.2d 501 (1975); *Holmes v. Powers,* 439 S.W.2d 579 (Ky. 1968); *In Interest of M.K.R.,* 515 S.W.2d 467 (Mo. 1974) (en banc); *Frazier v. Levi,* 440 S.W.2d 393 (Tex. Civ. App. 1969). These cases variously involve evidence of verifiable medical necessity and therapeutic need; likelihood of psychiatric harm absent sterilization; already existing retarded or illegitimate offspring; propensity to, or actually having engaged in sexual relations; and high probability of transmitting disabilities to any offspring. Regardless of the asserted need, these courts have denied sterilization, deferring on jurisdictional grounds to what they consider to be exclusively a legislative prerogative.

Other cases hold that trial courts of general jurisdiction, either by statute, the exercise of inherent equity powers, including application of the *parens patriae* doctrine, or the doctrine of substituted consent, have subject matter jurisdiction to grant petitions authorizing sterilization of incompetent persons in appropriate cases. Some of these cases, independent of statute, impose strict procedural and substantive safeguards upon the determination of such petitions. For example, in *Matter of C.D.M.,* 627 P.2d 607 (Alas. 1981), the parents of a 19-year-old mildly retarded female with Down's Syndrome filed a petition for her sterilization. By statute, guardians were authorized to "give any consents . . . that may be necessary to enable the ward to receive medical or other professional care." 627 P.2d at 612. The evidence showed a high probability that the child's offspring, if any, would be born with Down's Syndrome. Relying upon the equity powers vested in trial courts of general jurisdiction, which encompassed the *parens patriae* power over incompetents, the court concluded that the trial judge, contrary to his holding, had subject matter jurisdiction to act on the petition. However, it withheld approval of the operation because adequate safeguards had not been observed in the proceedings below. The court established the following minimum standards to govern the determination of a petition for sterilization of incompetent persons:

(1) Those advocating sterilization bear the heavy burden

of proving by clear and convincing evidence that sterilization is in the best interests of the incompetent;

(2) The incompetent must be afforded a full judicial hearing at which medical testimony is presented and the incompetent, through a guardian *ad litem,* is allowed to present proof and cross-examine witnesses;

(3) The trial judge must be assured that a comprehensive medical, psychological, and social evaluation is made of the incompetent;

(4) The trial court must determine that the individual is legally incompetent to make a decision whether to be sterilized and that this incapacity is in all likelihood permanent;

(5) The incompetent must be capable of reproduction and unable to care for the offspring;

(6) Sterilization must be the only practicable means of contraception;

(7) The proposed operation must be the least restrictive alternative available;

(8) To the extent possible, the trial court must hear testimony from the incompetent concerning his or her understanding and desire, if any, for the proposed operation and its consequences, and finally,

(9) The court must examine the motivation behind the petition. *Id.* at 612-13.

The Supreme Court of Washington reached similar conclusions in *Matter of Guardianship of Hayes,* 93 Wash. 228, 608 P.2d 635 (1980) (en banc). It reversed the judgment of the trial court which had declined to authorize the sterilization of a 16-year-old severely retarded female on the ground of lack of subject matter jurisdiction. In that case, it was shown that the relevant guardianship statute neither authorized nor prohibited sterilization procedures at a guardian's request. The child's mother had petitioned for sterilization because she believed that her daughter was sexually active and because she was concerned about the long-term effects of conventional birth control methods. The

court in *Hayes* decried the refusal of other courts to decide this type of case due to an alleged lack of jurisdiction, terming these holdings an "abdication of the judicial function." *Id.* at 637. It held that a statute was not required to empower the trial court to exercise its jurisdiction, because that power was vested in the court under the state's constitution. The court was unwilling, however, to *sua sponte* approve an order of sterilization absent compliance with most of the safeguards outlined in *Matter of C.D.M., supra,* to which it added a requirement that it be shown by clear, cogent, and convincing evidence that the current state of scientific and medical knowledge does not suggest either (a) that a reversible procedure or other less drastic contraceptive method will shortly be available, or (b) that science is on the threshold of an advance in treatment of the individual's disability. *Id.* at 641. Furthermore, the court stated that the heavy presumption against sterilization will be even more difficult to overcome in the case of an incompetent minor, whose youth may "make it difficult or impossible to prove by clear and convincing evidence that he or she will never be capable of making an informed judgment about sterilization or of caring for a child." *Id.* The court expressed the belief that only in rare cases would sterilization be in the best interests of the retarded person.

In the case of *In Re Grady,* 85 N.J. 235, 426 A.2d 467 (1981), the parents of 19-year-old Lee Ann, a mentally retarded woman with Down's Syndrome, sought a court order authorizing the performance of a tubal ligation. Lee Ann had been taking birth control pills for four years but her parents wanted her to become less dependent on their supervision. The court attempted to reconcile the conflict between Lee Ann's diverse privacy rights — her right to bodily integrity and to be free from sterilization on the one hand, and on the other, her "right" to be sterilized, *id.* at 471-73, citing *Griswold v. Connecticut,* 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972); *Carey v. Population Services Int'l,* 431 U.S. 678, 97 S. Ct. 2010, 52 L. Ed. 2d 675 (1977); *Planned Parenthood of Missouri v. Danforth,* 428

U.S. 52, 96 S. Ct. 2831, 49 L. Ed. 2d 788 (1976); *Doe v. Bolton,* 410 U.S. 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). Stating that courts which decline to assume jurisdiction do not reflect "adequate sensitivity to the constitutional rights of the incompetent person," the New Jersey court resolved the conflict in favor of Lee Ann's "right" to be sterilized, premising its decision on the doctrines of *parens patriae* and substituted consent, citing *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 97 S. Ct. 319, 50 L. Ed. 2d 289 (1976) (court authorized parents of a comatose 22-year-old to consent to removal of extraordinary artificial life support apparatus). As in *Matter of C.D.M.* and *Hayes,* the court enumerated a myriad of factors to be considered in determining whether sterilization was in the best interest of the incompetent person.

In yet another case, *In re Penny N.,* 120 N.H. 269, 414 A.2d 541 (1980), the court held that the trial judge had jurisdiction to consider a petition for sterilization, but it refused to order the procedure because sufficient safeguards had not been utilized. There, parents of a 14-year-old girl suffering from Down's Syndrome, severe psychomoter retardation and impaired hearing sought a court order authorizing a hysterectomy. The child had the intelligence level of a 2-year-old, was unable to speak, clothe, or feed herself, and was not toilet trained. In addition, Penny's doctors believed that she was suffering from severe psychological problems which would be aggravated if she began menstruation. In holding that the probate court had jurisdiction to authorize the sterilization, the Supreme Court of New Hampshire relied on a statute that prohibited a guardian from giving "consent for ... sterilization ... unless the procedure is first approved by order of the probate court." *Id.* at 542. The court, however, remanded the case for further proceedings and the adoption of standards similar to those outlined in *In Re Grady, supra,* stating:

> "a probate judge may permit a sterilization after making specific written findings from clear and

convincing evidence, that it is in the best interests of the incapacitated ward, rather than the parents' or the public's convenience, to do so." *Id.* at 543.

*Matter of A. W.,* Colo., 637 P.2d 366 (1981) (en banc), involved a severely mentally retarded 15-year-old female whose parents had petitioned the district court (a court of general jurisdiction) to authorize a hysterectomy. The parents were concerned over the child's fear and fright of the menstrual process and also because of the possibility that she could become pregnant. The evidence showed that the child was physiologically normal and therefore perfectly capable of conceiving a child. The child's physician recommended a hysterectomy to avoid pregnancy and to discontinue the menstrual cycle. The trial court granted the petition on the basis of a Colorado statute generally empowering parents to request medical or surgical care for their child. The Supreme Court of Colorado reversed, concluding "that sterilization of a mentally retarded minor is a special case not covered by the general parental consent statute." 637 P.2d at 368. The court further concluded that a Colorado statute authorizing sterilization of mentally retarded adults, but which was silent as to minors, did not limit the district court's jurisdiction to order sterilization of mentally retarded minors. It held that the district court's broad grant of constitutional authority to determine all civil cases vested it with inherent, nonstatutory powers of adjudication, including the power to consider petitions for sterilization of retarded minors under the *parens patriae* doctrine. The court said:

"Inherent *parens patriae* jurisdiction over incompetents may extend to decisions involving irrevocable consequences for the incompetent individual. Courts have accepted responsibility for deciding whether to authorize a kidney transplant from an incompetent to his gravely ill brother, *Strunk v. Strunk,* 445 S.W.2d 145 (Ky. App. 1969); whether to consent on behalf of the incompetent to shock treatment, *Price v. Sheppard,* 307 Minn. 250, 239

N.W.2d 905 (1976); whether to administer chemotherapy treatment, *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 738, 370 N.E.2d 417 (1977); and whether to discontinue artificial life support mechanisms, *In re Quinlan*, 70 N.J. 10, 355 A.2d 647, *cert. den.* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976)." *Id.* at 374.

In determining the merits of the sterilization petition, the Colorado court adopted standards to guide the discretion of the trial judge similar to those adopted in *Matter of C.D.M., Hayes,* and *Grady,* all *supra.* Another standard required the trial judge to find by clear and convincing evidence that the sterilization was "medically essential," as to which the court said:

"A sterilization is medically essential if clearly necessary, in the opinion of experts, to preserve the life or physical or mental health of the mentally retarded person. The term 'medically essential' is reasonably precise and provides protection from abuses prevalent in this area in the past. The term also avoids confusion as to whose interests are to be considered. It is not the welfare of society, or the convenience or peace of mind of parents or guardians that these standards are intended to protect. The purpose of the standards is to protect the health of the minor retarded person, and to prevent that person's fundamental procreative rights from being abridged. In some circumstances, the possibility of pregnancy, if supported by sufficient evidence that it would threaten the physical or mental health of the person and that no less intrusive means of birth control would prove safe and effective, could justify granting a petition for sterilization as medically essential." *Id.* at 375-76.

Another view of the problem was taken in *Matter of Guardianship of Eberhardy,* 102 Wis.2d 539, 307 N.W.2d 881 (1981). That case involved a petition for sterilization by

the guardians/parents of Joan, a 22-year-old mentally retarded woman. The petition was motivated by Joan's parents' belief that she had engaged in sexual activity at a summer camp for the mentally retarded and because Joan's physician recommended sterilization as "she would be unable to care for a child and the chances of a child being severely handicapped were considerable." *Id.* at 883. Joan's parents rejected her usage of an I.U.D. and sought court approval of a tubal ligation. In reversing the judgment of the circuit court that no jurisdiction existed to act on the petition, the Supreme Court of Wisconsin held that the state constitution vested in such courts "jurisdiction in all matters civil and criminal." *Id.* at 885. After an extensive account of Wisconsin's experience with a now repealed eugenic sterilization statute, the court reviewed the dangers and pitfalls involved in a nonstatutory, judicial determination of the merits of a petition for sterilization, *i.e.,* the often subjective nature of the decision, the irreversibility of errors of judgment, the conflicting rights of the parties involved and the inability of courts to deal with the necessary medical technology. Taking all these factors into consideration, the court, although acknowledging the jurisdiction of circuit courts in such cases, concluded that they were not the appropriate forum to resolve such delicate issues of public policy. The court nevertheless stated that if the legislature did not act to develop guidelines and standards for sterilization of incompetents, it would not continue to exercise judicial restraint. *Id.* at 899.

The most recent case on the subject, *In the Matter of Mary Moe,* 385 Mass. 555, 432 N.E.2d 712, decided March 16, 1982, involved a petition to sterilize a severely retarded adult woman. The Supreme Judicial Court of Massachusetts concluded that the trial court — a court of general equity jurisdiction — possessed inherent equitable power to grant a petition for sterilization, shown to be in the best interest of the mentally incompetent ward. In so holding, the court said "that the [trial] court is to determine whether to authorize sterilization when requested by the parents or guardian by finding the incompetent would so choose if competent."

Slip op. at 17. It indicated that medical necessity was but one relevant factor to be assessed in evaluating whether sterilization was in the best interests of the disabled ward. As to this factor, the court indicated that medical necessity would be demonstrated by proof that pregnancy would threaten the physical or mental health of the incompetent person, with the weight given this factor being dependent upon the facts of the case and the degree of medical necessity. The Massachusetts court concluded that, in applying the standards, the trial judge must

> "exercise the utmost care in reviewing all the evidence presented and in determining whether the ward would consent to sterilization if competent to make such a decision. *Id.* at 885-886. The judge must enter detailed written findings indicating those persuasive factors that determine the outcome. We are persuaded that a conscientious judge, being mindful of adverse mental and social consequence which might follow the authorization or not of a sterilization operation, will give serious and heedful attention at all stages of the proceeding."
> Slip op. at 25-26.

## IV

There is no Maryland statute explicitly authorizing courts to approve petitions for the sterilization of any person. Title 13 of the Estates and Trusts Article entitled "Protection of Minors and Disabled Persons" provides in § 13-105 that circuit courts have jurisdiction over guardianship "of the person of a minor and over protective proceedings for minors . . . [and] for disabled persons." As originally enacted by ch. 11 of the Acts of 1974, Title 13 defined a "disabled person" in § 13-101 (c) as "a person *other than a minor*" adjudged by a court to be unable to manage his property because of various enumerated physical, mental and other disabilities.

(Emphasis supplied.) [1] A "minor" was defined in § 13-101 (i) as a person under the age of 18 years. Chapter 11 of the Acts of 1974 also enacted Subtitle 7 of Title 13, which was entitled "Guardian of the Person"; the new subtitle encompassed §§ 13-701 through 13-704. Section 13-702, captioned "Court appointment of guardian of a minor" simply provided that "the court may appoint a guardian of the person of an unmarried minor." Section 13-704 entitled "Court appointment of guardian of the person of a disabled person" provided that the court may "superintend and direct the care of a disabled person," appoint a guardian therefor and pass orders "directing the disabled person to be sent to a hospital." Neither section delineated with specificity the powers and duties of the guardian.

Title 13 was extensively amended by ch. 768 of the Acts of 1977, which was entitled "An Act Concerning Adult Protective Services." The definition of a "disabled person" was broadened to include a person adjudged by a court "to be unable to provide for his daily needs sufficient to protect his health or safety" because of mental incapacity. The 1977 amendatory act divided the provisions of Subtitle 7 into two parts, the first entitled, "Part I. Minors," which was applicable only to §§ 13-701 through 13-703. The general provision in § 13-702 that the court was empowered to appoint a guardian of the person of an unmarried minor remained unchanged by the amendatory act. Part II of Subtitle 7 was entitled, "Disabled Persons." Included within this Part were new sections — § 13-705, which authorized appointment of a guardian for a "disabled person," and § 13-708, which enumerated the guardian's rights, duties and powers. As earlier indicated, § 13-708 authorizes the court to grant to guardians only those powers necessary to provide for the "demonstrated need" of the "disabled person" including, but not limited to, the same authority that a parent has with respect to an unemancipated minor child; the care, comfort, training, education and maintenance of

---

1. As originally introduced, § 13-101 (c) provided that a "disabled person . . . may not be a minor."

the disabled ward; and the power to give necessary consent for medical or other professional care or treatment with the qualification, however, that the guardian must seek court approval before consenting to any medical procedure that involves a substantial risk to life.

From the aforegoing it is evident that § 13-708 does not apply to guardianship of the person of a minor. Thus, the provisions of this section, which permit a guardian of a "disabled person" to consent to a medical procedure where a "demonstrated need" therefor is shown, are not applicable in this case. We think, however, that the statutory formulation of § 13-708 essentially parallels and is declaratory of the common law *parens patriae* powers of circuit courts over incompetent minors. In enacting § 13-702, expressly recognizing the authority of circuit courts to appoint a guardian of the person of a minor, but without delineating the guardian's powers and duties, the legislature intended that circuit courts would exercise their inherent equitable jurisdiction over guardianship matters pertaining to minors, adopting standards with respect thereto as would be consistent with and in furtherance of the incompetent ward's best interests. *See* § 1-501 of the Courts Article which, in implementation of the provisions of Article IV, § 20 of the Constitution of Maryland,[2] specifies that circuit courts

"are the highest common-law and equity courts of record exercising original jurisdiction within the State ... [with] full common-law and equity powers and jurisdiction in all civil and criminal cases within [their] count[ies], and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal."

---

**2.** This section of the Maryland Constitution provides:

"A Court shall be held in each County of the State to be styled the Circuit Court for the County, in which it may be held. The said Circuit Courts shall have and exercise, in the respective counties, all the power, authority and jurisdiction, original and appellate, which the present Circuit Courts of this State now have and exercise, or which may hereafter be prescribed by law."

The *parens patriae* jurisdiction of circuit courts in this State is well established. The words *"parens patriae,"* meaning "father of the country," refer to the State's sovereign power of guardianship over minors and other persons under disability. *See* 67A C.J.S. *Parens Patriae,* at 159 (1978); Black's Law Dictionary 1003 (5th ed. 1979). It is a fundamental common law concept that the jurisdiction of courts of equity over such persons is plenary so as to afford whatever relief may be necessary to protect the individual's best interests. *See* 27 Am. Jur. 2d *Equity* § 69 (1966); 39 Am. Jur. 2d *Guardian and Ward* §§ 9, 61 (1968); 59 Am. Jur. 2d *Parent and Child* § 9 (1971). Maryland cases are generally in accord. *See Taylor v. Taylor,* 246 Md. 616, 229 A.2d 131 (1967); *Thistlewood v. Ocean City,* 236 Md. 548, 204 A.2d 688 (1964); *Stirn v. Stirn,* 183 Md. 59, 36 A.2d 695 (1944); *Barnard v. Godfrey,* 157 Md. 264, 145 A. 614 (1929); *Jenkins v. Whyte,* 62 Md. 427 (1884); *Ellis v. Ellis,* 19 Md. App. 361, 311 A. 2d 428 (1973). Indeed, as we pointed out in *Kircherer v. Kircherer,* 285 Md. 114, 400 A.2d 1097 (1979):

> "[A] court of equity assumes jurisdiction in guardianship matters to protect those who, because of illness or other disability, are unable to care for themselves. In reality the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility."

We conclude, therefore, that as to incompetent minors circuit courts, acting in pursuance of their inherent *parens patriae* authority, have subject matter jurisdiction to consider a petition for an order authorizing a guardian to consent to the sterilization of an incompetent minor. *See Stump v. Sparkman,* 435 U.S. 349, 98 S. Ct. 1099, 55 L. Ed. 2d 331 (1978).

## V

In determining whether a petition to authorize a guardian to consent to sterilization of an incompetent minor is in the

minor's best interest, it is essential that the circuit court take into account and be guided by the following minimal standards, which we adopt today in order to safeguard and secure the rights of the ward.

First, the court must appoint an independent guardian *ad litem* to act on the disabled ward's behalf, with full opportunity to meet with the ward and to present evidence and cross-examine witnesses at a full judicial hearing. *See* Maryland Rule R78. Second, the court must receive independent medical, psychological and social evaluations by competent professionals and may, if deemed advisable, appoint its own experts to assist in the evaluation of the ward's best interests. Third, the court should personally meet with the minor ward to obtain its own impression of the individual's competency, affording the ward a full opportunity to express his or her personal views or desires with respect to the judicial proceedings and the prospect of sterilization. Fourth, the trial judge must find, by clear and convincing evidence, that the individual lacks competency to make a decision about sterilization and, further, that the incapacity is not likely to change in the foreseeable future. Fifth, the court must be satisfied by clear and convincing evidence that sterilization is in the best interests of the incompetent minor. This determination involves a number of factors, including whether the incompetent minor is capable of reproduction, the child's age and circumstances at the time of the petition, the extent of the child's exposure to sexual contact that could result in pregnancy, the feasibility of utilizing effective contraceptive procedures in lieu of sterilization, the availability of alternative and less intrusive sterilization procedures, and the possibility that scientific advances may occur in the foreseeable future, which could result in improvement of the ward's mental condition. In addition to these factors, the trial court, before authorizing sterilization as being in the best interests of the incompetent minor, must find by clear and convincing evidence that the requested operative procedure is medically necessary to preserve the life or physical or mental health of the incompetent minor. *See Matter of A.M., supra.*

## VI

In refusing to authorize sterilization in this case, the trial judge concluded from the evidence that sterilization by hysterectomy to terminate Sonya's menstrual cycle and to prevent her pregnancy was not, within the contemplation of § 13-708's "demonstrated need" formulation, necessary to preserve her life or physical or mental health. While the court noted the absence of any statutory authority or guidance other than that contained in § 13-708, it did not, as we read its opinion, find an absence of subject matter jurisdiction to determine the merits of the petition; it simply found, in light of the evidence in the case, a lack of justification for granting the petition, *i.e.*, that no "demonstrated need" was established.

As we have indicated, § 13-708 has no application to guardianship of the person of an incompetent minor. Consequently, the trial court was wrong in applying the provisions of that section in this case, although the ultimate issue which it considered was for all practical purposes virtually identical to that involved in determining the merits of a petition to sterilize an incompetent minor under common law equitable principles, *i.e.*, whether, in view of the evidence presented, sterilization was shown to be in the best interests of the incompetent minor. We think the trial judge properly concluded that Sonya lacked the mental capacity to herself consent to the operation. Moreover, we think the trial judge was correct in determining that the evidence failed to disclose that sterilization by hysterectomy was in Sonya's best interest as being necessary for her medical or mental health. Manifestly, the fact that Sonya experiences pain and irritation during her menstrual cycle, which she does not understand and with which she has difficulty in coping, does not in itself provide any basis for authorizing a hysterectomy. Nor does the mere fact that Sonya could become pregnant and give birth to a child, for whom she could not care, provide justification to authorize the operation. Indeed, in considering the best interests of an incompetent minor, the welfare of society or the convenience or

peace of mind of the ward's parents or guardian plays no part.

Considering Sonya's age and present circumstances, the absence of any evidence, much less clear and convincing evidence, of any medical necessity for the sterilization procedure at this time, no useful purpose would be served by remanding the case to the trial court for further proceedings in light of today's opinion.[3]

We recognize, of course, that declaration of the public policy of this State is normally a function of the legislative branch of government. *Felder v. Butler,* 292 Md. 174, 438 A.2d 494 (1981). In view of the profound and recurring nature of the issue here involved, and its obvious importance to the public, the legislature may deem it appropriate at this time to declare the law of the State by enacting a statute governing the granting of consent for sterilization of mentally incompetent minors.

*Judgment affirmed, with costs.*

*Smith, J., concurring in part and dissenting in part.*

I fully agree with much of what Chief Judge Murphy has said in his excellent opinion for the majority. I disagree with the final result, however. I believe this record is sufficient for a court of equity, a court of conscience if you will, to grant the relief prayed.

There are a number of things which should be borne in mind in this case. First of all, the trial judge here was sitting as a chancellor in equity. As E. Miller, *Equity Procedure* § 1,

---

**3.** Maryland Code (1980 Repl. Vol.), Art. 43, § 135 (a) (2) provides that a minor has the same capacity to consent to medical treatment as an adult if, *inter alia,* "[t]he minor seeks treatment or advice concerning venereal disease, pregnancy or contraception *not amounting to sterilization."* (Emphasis supplied.) This section prevents a minor, acting alone, from consenting to sterilization; it does not, however, preempt the power of the court, acting within its *parens patriae* jurisdiction, from authorizing the guardian of the person of an incompetent minor to consent to sterilization where it is shown, by clear and convincing evidence, that such a procedure is in the best interest of the ward.

at 1 (1897), puts it, "The chancery court of England has always been considered as the prototype of that of Maryland . . . ." Equity originated in England to avoid the harsh rules of the common law. A distinguished Maryland jurist and teacher of the last century, C. Phelps, comments in *Juridical Equity* 213 (1894), "Equity . . . recognizes new adjustments for new situations, not upon a dogmatic basis, but upon principles which address themselves to the conscience and intelligence, and therefore admit of a rational and progressive development." Similarly, 27 Am. Jur. 2d *Equity* § 2, at 518 (1966), states, "It has been said that one of the most salutary principles of chancery jurisprudence is that, strictly speaking, it has no immutable rules. It lights its own pathway, blazes its own trail, paves its own highway; it is, in short, an appeal to the conscience of the court." Then we find in 30 C.J.S. *Equity* § 1, at 780 (1965), that "a court of equity is a court of conscience . . . ."

Secondly, we need to remember as the majority opinion states, that we know that this young woman cannot exercise what some call "the fundamental right to bear and beget children" with any degree of understanding. This is so because her brain injury is irreversible; the psychiatrist in his testimony estimated that her IQ is "[t]wenty-five to thirty," and said that given this IQ she would be comparable to an individual "of around the age of one or two, one and a half to two." We know full well that a two year old would not understand the act of copulation. Thus, logic indicates that if she becomes pregnant it will not be the result of any conscious decision on her part, but will be the consequence of some illegitimate act.

Thirdly, it was the difficulties connected with menstruation, not the problems arising from pregnancy, which apparently have motivated the aunt in her request for the operation. This is what she dwelt upon in her testimony on direct examination. (The aunt and the grandmother were the petitioners for guardianship. On the day of the hearing the grandmother was hospitalized.) The record states:

"Q   Now, in living in the home in the last three

years I would assume you had the observation — opportunity to observe Sonya before the menstrual cycle began and when it began, during and after; can you characterize her attitude for us prior to, during and after the menstrual cycle?

"A   Well, as I stated before, Sonya is ill a lot but during that time it caused confusion for her. She appeared disoriented and uncomfortable.

"Sonya cannot communicate where her discomforts are and the family has to more or less determine what's wrong with her when she seems to be ill or uncomfortable.

"We have to determine what is hurting her. It could be her head, and yet we would think it might have been her stomach that is hurting. She can't — I suppose she doesn't know where pain comes from. She feels uncomfortable, but she cannot communicate where the pain is coming from."

One would not expect more from a person of Sonya's mental age. The only time on direct examination of the aunt that pregnancy was even mentioned was this single question and answer:

"Q   Do you think Sonya could care for a child if she were to conceive and have a child?

"A   Not at all."

Fourthly, the psychiatrist made it abundantly clear that the *principal* reason for this proposed "subtotal hysterectomy" was not the fear of pregnancy.[1] Aside from

---

**1.** He explained the nature of a subtotal hysterectomy:

"Q   Could you characterize from a medical standpoint how this hysterectomy would benefit the child?

"A   Well, a subtotal hysterectomy would be a hysterectomy in which her uterus would be removed, her ovaries would not be, she will not thereby be castrated.

"She would have ovarian function. She would ovulate regularly. She would not have menses, and she would not have the problems that youngsters her age or women would have, menstrual cramps, premenstrual tension, difficulties of that kind because she does not

that which we have quoted in n.1, no other reference to pregnancy was made on direct examination of the psychiatrist. Rather, the matter of pregnancy was a theory that Sonya's court-appointed counsel developed on cross-examination. The record reflects on direct examination:

"Q    Within a reasonable degree of medical certainty, do you have an opinion of whether or not this hysterectomy would be in the child's best interest?

"A    I believe it would be.

"Q    Can you support it for any reason, sir?

"A    Well, when Sonya has her period, which you must know I have not observed, it is strictly the history, and in psychiatry we have to rely on the history of those who are around, the description that I have is that she — . . . . When she has her period, she doesn't come downstairs. She wants to stay in bed much of the day, and she can't go to school.

"She whimpers, and she gets cross. She hollers to quote Mrs. Wentzel. She doesn't wear her napkin. She may get up to go to the bathroom, and she takes her napkin off, and doesn't quite understand what it's all about.

"She has pain that she cannot really tell us about or tell her parents about anytime. It's always been a problem when she's febrific or ill that she has not

---

understand what is going on and has this kind of difficulty and does not comprehend all of this. It would seem that she would be happier without having all of that.

"Q    Could you repeat, once again, the label that you gave to this operation?

"A    It would be a subtotal hysterectomy.

"Q    Subtotal hysterectomy?

"A    Yes. '

"Q    Would you give us your opinion of what effect a subtotal hysterectomy would have on her capability to bear children?

"A    She would not be able to bear children period."

been able to indicate where she's having difficulty except through careful questioning and a woman's intuition to understand.

"In view of the fact that she's unable to communicate these matters it makes it difficult for those who are caring for her to understand always what is happening because she does not have the capacity to speak her mind when something is wrong, and in view of the fact that she is not able to give an indication when she is ill as to what the matter might be, and in view of the fact that she has such a great deal of discomfort with her periods it would seem to me reasonable to recommend this from a medical point of view.

"The emotional stirs inside of her and she doesn't understand it, to me that is sufficient reason to recommend this."

The record on cross-examination states:

"Q   Isn't it the truth that the principal reason why the family desires the hysterectomy is because they feel that Sonya Star Flanary is incapable of caring for a child; isn't that correct?

"A   No, sir. That's not correct.

"Q   You didn't tell me that?

"A   No.

"Q   Doctor —

"A   There is a problem there.

"Q   Well, let's hear the problem. The Court would like to know.

"A   Well, you seem to have the problem, not I, about that.

"Q   Isn't it a fact, Doctor, that the reality of the situation and the tragedy of the situation is that Sonya is in a situation daily going to school and so forth that she could have an unwanted pregnancy; isn't that correct?

"A   That's true. She could become pregnant, no doubt about that. There is no doubt that the parents are concerned about that possibility. I did not say that was the principal reason, okay. I said it's multidetermined. Naturally. Of course. All right.

"Q   And if Sonya had a child and you told me that she was perfectly capable from what you can understand of having a child and a normal child?

"A   That's correct.

"Q   Because her disability is traumatically induced; if she had a child obviously she cannot take care of that child at all?

"A   That's correct.               .

"Q   Then the burden and the decision would be, one, to abort or if to have the child this would be an added burden on the Wentzel/Flanary family, would it not?

"A   That's correct.

"Q   And the Wentzel/Flanary family, Wentzel being the grandmother and Flanary being the mother, is very concerned about this fact, are they not, about the unwanted child?

"A   They voiced concerns to me about the possibility, right. I think the reasons are obvious when you see her that she is rather an attractive girl even though she has limitations with the left side of her hemiparesis, the concern of the family is not so much at the present time but later on when Mrs. Wentzel is no longer able to care for her because of her age and so forth. I think that's another subject concerning guardianship — I don't care to be concerned, but when she is being treated by other people or taken care of by other people that's a reasonable question. It is not the principal one.

"Q   You think that the —

"A   I don't know that there is a principal one. I

think that is a concern of theirs, but they also wish to see her free of a lot of discomfort and pain.

"Q   But the freedom from discomfort and pain does not make this surgical procedure medically necessary, does it?

"A   Not in itself.

"Q   Well, is there anything life threatening about her having a child?

"A   No, there is not a life threatening issue there.

"Q   It just becomes medically more convenient to have the subtotal hysterectomy; is that correct, Doctor?

"A   It is convenient in the sense that she would not have the discomfort and the emotional turmoil thereby surrounding it and other aspects of this are quite obvious in terms of her hygienic care and so on.

"Q   Am I correct in characterizing this subtotal hysterectomy as an operation of convenience?  Rather than an operation of necessity?

"A   Well, it's a matter of what one means by that.

"Q   Well, then let's break down necessity. Necessity means something you cannot do without, isn't that true?

"A   That's true. If we take it in the strictest sense of the word, that's true.

"Q   Is this an operation that is necessitous in that respect?

"A   No.

"Q   Then it is then more an operation of convenience, am I correct, Doctor?

"A   In that "medical sense" yes. Can we take into consideration emotions. Is that all right? We couldn't say this is necessary. She's not going to go

> crazy emotionally if she doesn't have a hysterectomy, but from an emotional point of view we can't compare her to other women with average intelligence and who can understand things and who can speak and walk and talk."

One could hardly expect to achieve toilet training of a child by the time he or she reaches the mental age of this young woman. It thus becomes obvious that she cannot be expected to understand the difficulties and the bodily functions associated with menstruation.

Much of what the Supreme Court of New Jersey said in *In re Grady,* 85 N.J. 235, 426 A.2d 467 (1981), merits repeating here. The young woman there involved was 19 years old and "seriously afflicted with Down's Syndrome." She was then about to leave her special class in the public school system. Her parents feared they would predecease their daughter and that she would be unable to live independently. For that reason they sought to obtain for her a life less dependent on her family. They wished to place her in a sheltered work group and eventually in a group home for retarded adults. The court said that the parents saw "dependable and continuous contraception as a prerequisite to any such change in their daughter's environment." 85 N.J. at 242. The court further stated that it "believe[d] that an individual's constitutional right of privacy included[d] the right to undergo sterilization voluntarily." *Id.* at 247. It pointed out that "[a] right to sterilization has yet to receive express constitutional protection from the United States Supreme Court," but said that this right "also derives from the rationale of [the New Jersey court's] decision in *In re Quinlan,* [70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922 (1976)]." 85 N.J. at 248-49. The court summarized its holding in *Quinlan:*

> "There we held that a person has a constitutional right to discontinue use of artificial life-sustaining apparatus when the prognosis for returning to cognitive or sapient life is dim. Our holding grew out of a belief that, under some circumstances, an

individual's personal right to control her own body and life overrides the state's general interest in preserving life. A decision to be sterilized is also a part of an individual's personal right to control her own body and life. The state's interest in procreation cannot be greater than its interest in preserving life. If one can decide to forgo artificial life-preservation and thereby sacrifice life, then one can certainly decide to forgo reproductive capacity and thereby relinquish the ability to procreate. Therefore, the right to be sterilized is included in the privacy rights protected by the federal Constitution." 85 N.J. at 249.

The New Jersey court discussed what it called "the right of meaningful choice," stating:

"Having recognized that both a right to be sterilized and a right to procreate exist, we face the problem, as in *Quinlan,* that Lee Ann Grady is not competent to exercise either of her constitutional rights. What is at stake is not simply a right to obtain contraception or to attempt procreation. Implicit in both these complementary liberties is the right to make a meaningful choice between them. Yet because of her severe mental impairment, Lee Ann does not have the ability to make a choice between sterilization and procreation, or between sterilization and other methods of contraception — a choice which she would presumably make in her 'best interests' had she such ability. But her inability should not result in the forfeit of this constitutional interest or of the effective protection of her 'best interests.' If the decision whether or not to procreate is 'a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice.' *Quinlan, supra,* at 41. To preserve that right and the benefits that a meaningful decision

would bring to her life, it may be necessary to assert it on her behalf.

". . . [W]e believe that an appropriate court must make the final determination whether consent to sterilization should be given on behalf of an incompetent individual. It must be the court's judgment, and not just the parents' good faith decision, that substitutes for the incompetent's consent." 85 N.J. at 250-51.

The court further said:

"Our decision thus far leads to the following conclusions. The right to choose among procreation, sterilization and other methods of contraception is an important privacy right of all individuals. Our courts must preserve that right. Where an incompetent person lacks the mental capacity to make that choice, a court should ensure the exercise of that right on behalf of the incompetent in a manner that reflects his or her best interests." *Id.* at 252.

It found that "[t]he inherent *parens patriae* jurisdiction of [the New Jersey] Chancery Division is broad enough to encompass the decision whether consent for sterilization should be given by a court on behalf of a person who lacks the capacity to give or withhold consent for himself." *Id.* at 259. The rules laid down by the New Jersey Supreme Court to determine whether a sterilization should be permitted are quite similar to those in the majority opinion.

On the issue of authority of a court to sanction the surgical procedure here contemplated, see also *in the Matter of Mary Moe,* 385 Mass. 555, 432 N.E.2d 712 (1982). After finding that the lower court possessed this authority, the Massachusetts court observed:

"We are aware of the difficulties of utilizing the substituted judgment doctrine in a case where the incompetent has been mentally retarded since birth. The inability, however, of an incompetent to choose, should not result in a loss of the person's

constitutional interests. *In the Matter of A.W.,* [637 P.2d 366,] 375 [(Colo. 1981)]. To speak solely in terms of the 'best interests' of the ward, or of the State's interest, is to obscure the fundamental issue: Is the State to impose a solution on an incompetent based on external criteria, or is it to seek to protect and implement the individual's personal rights and integrity? We reject the former possibility. Each approach has its own difficulties, but the use of the doctrine of substituted judgment promotes best the interests of the individual, no matter how difficult the task involved may be. We admit that in this case we are unable to draw upon prior stated preferences the individual may have expressed. An expression of intent by an incompetent person while competent, however, is not essential. *In the Matter of Spring,* [380 Mass. 629, 405 N.E.2d 115, 122 (1980)]. 'While it may thus be necessary to rely to a greater degree on objective criteria . . . the effort to bring the substituted judgment into step with the values and desires of the affected individual must not, and need not, be abandoned.' *[Superintendent of Belchertown State School v.] Saikewicz,* [373 Mass. 728,] 751 [, 370 N.E.2d 417 (1977)]. Cf. *In the Matter of Storar,* 52 N.Y.2d 363, 380 (1981) (unrealistic to attempt substituted judgment where person incompetent since birth). The courts thus must endeavor, as accurately as possible, to determine the wants and needs of this ward as they relate to the sterilization procedure. See *Saikewicz, supra* at 750 n.15.". 432 N.E.2d at 720.

I also find relevant the court's comment in *In re Weberlist,* 79 Misc. 2d 753, 360 N.Y.S.2d 783 (1974). There an individual with an IQ of approximately twenty apparently had been abandoned by his parents. He was then about 22 years of age and a resident of Manhattan Developmental Services. Certain treatments were proposed for him which included "dental work and hand surgery, surgery for the cleft palate

and jaw, and intracranial surgery for facial restoration." 360 N.Y.S.2d at 785. The court grounded its decision on the parens patriae doctrine and, recognizing its responsibilities, stated:

"The Court is faced with the possibility that the ward may simply serve as an object for experimentation. Organized concern with the threat of human experimentation can be dated back to the so-called Nuremberg Code of 1946. (See, e.g. Symposium on Ethical Aspects of Experimentation with Human Subjects, 98 Daedalus 219, et seq. [1969]; Freund, Ethical Problems in Human Experimentation, 273 New Engl.J.Med. 687 [1967]; Curran & Beecher, Experimentation in Children, 10 J.A.M.A. 77 [1969]; Lasagna, Special Subjects in Human Experimentation, 98 Daedalus, 449 [1969]; Note, Experimentation on Human Beings, 20 Stan.L.Rev. 99 [1967]; Rules and Regulations of the U.S. Dept. of Health, Education and Welfare in the Protection of Human Subjects, effective July 1, 1974). It may well be that: 'Human experimentation has been a part of medical science since it gained the title of "science" some centuries ago. There are still physicians who insist that all medical treatment is still experimental.' (Curran and Shapiro, Law, Medicine and Forensic Science [Second Edition, 1970] p. 887) but the critical factor in this case is its beneficial potential for Eugene Weberlist." 360 N.Y.S.2d at 787 (brackets in original).

The court concluded:

"In this case, the Court must decide what its ward would choose, if he were in a position to make a sound judgment. Certainly, he would pick the chance for a fuller participation in life rather than a rejection of his potential as a more fully endowed human being. The Court does not know what the future holds in store for its unfortunate ward —

whether the treatment will be successful. But the most humble of us is entitled to the promise of the Declaration of Independence for 'Life, Liberty and the pursuit of Happiness'. We owe the respondent that opportunity and accordingly, the Court authorizes the proposed medical intervention." 360 N.Y.S.2d at 787.

Do my colleagues doubt for one instant what Sonya's choice would be under the circumstances here if she "were in a position to make a sound judgment"? I am certain she would give her assent. From the testimony of the aunt and the psychiatrist which we have set forth, one can see how Sonya is completely unable to cope with menstruation. Furthermore, it would be a terrible thing for this young lady to become pregnant. Imagine what it would be like for a person with a mental age comparable to that of a one and half to a two year old child to be pregnant. She would not have the mentality to understand that which was taking place, just as she does not understand relative to menstruation and her hygienic care. The process of childbirth undoubtedly would be a terrifying one for her.

This case cries out to the conscience of an equity court for relief. This young woman, her mother, her aunt, and her grandmother are all suffering as a result of the accidental injuries inflicted upon the girl a number of years ago. They are all entitled, as the New York court put it in *In re Weberlist*, "to the promise of the Declaration of Independence for 'Life, Liberty and the pursuit of Happiness.' " Most of the members of this Court are parents. Each of us certainly has some conception of what may be expected from a child of the mental age of this young lady. No one questions the brain injury, the irreversible nature of the injury, and the mental age of the court's ward. All agree as to the accuracy of this statement. Indeed, the majority says, "We think the trial judge properly concluded that Sonya lacked the mental capacity to herself consent to the operation." Therefore, I am of the view that the testimony here of the aunt and the psychiatrist relative to the problems con-

cerning menstruation make out a case by clear and convincing evidence that it is in this young lady's best interests that the surgical procedures which the psychiatrist advocates be performed. Although the problems which would be associated with her becoming pregnant are strong and compelling reasons for authorizing the procedure, these problems are merely additional reasons for granting the requested relief.

I would reverse and direct that a decree be entered authorizing the subtotal hysterectomy.

*Digges, J., concurring in part and dissenting in part.*

I fully concur in the views of the Court as expressed in its opinion written by Chief Judge Murphy. However, prior to today's decision there existed in this State a sparsity of precedence and guidance for litigants and trial courts with regard to the subject of this very important litigation. Accordingly, I would, in the interest of justice, not affirm the judgment but remand the case to the trial court (with additional testimony being permitted) for evaluation of the evidence and a new decision by the chancellor rendered in light of the opinion now being filed. Maryland Rule 871.

*Davidson, J., dissenting:*

I agree with the majority that circuit courts "have subject matter jurisdiction to consider a petition for an order authorizing a guardian to consent to the sterilization of an incompetent minor." I further agree with the majority that in determining whether such a petition is in the best interests of the incompetent minor, it is essential that the circuit court take into account and be guided by certain minimal standards. However, I do not agree with certain aspects of the standard adopted by the majority relating to the determination of what is in the best interests of the incompetent minor because that standard does not include some factors that should be considered by a trial court. In my view, the trial court must not only consider the factors articulated by the

majority, but additionally must also consider: 1) whether the incompetent minor presently lacks an understanding of the reproduction process, including menstruation and pregnancy, and will continue to lack that understanding in the future; 2) whether the incompetent minor is presently unable to care for a child and will continue to be unable to do so in the future; and 3) whether the incompetent minor's risk of psychological trauma or damage resulting from pregnancy outweighs the risk of such trauma or damage resulting from a sterilization procedure.

More important, by requiring the trial court to find "by clear and convincing evidence that the requested operative procedure is medically necessary to preserve the life or physical or mental health of the incompetent minor," the majority places undue and improper emphasis upon the factor of medical necessity. In so doing, the majority makes the factor of medical necessity controlling in determining whether a petition to authorize a guardian to consent to sterilization of an incompetent minor is in the best interests of the incompetent minor. For the reasons set forth below, I would not treat this factor as controlling, but rather would regard it as one of the many factors to be considered in determining whether sterilization is in the best interests of the incompetent minor.

In my view, an individual has a constitutional right to privacy including the right to voluntary sterilization. As long ago as 1942, in *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113 (1942), the United States Supreme Court held that a state could not sterilize a "habitual criminal." Thus, it recognized procreation as a fundamental right. In *Griswold v. Connecticut,* 381 U.S. 479, 485-86, 85 S.Ct. 1678, 1682 (1965), that Court held that the state could not interfere with a married person's right to use contraceptives. Thus, the Supreme Court established a constitutionally protected right to privacy including the right to make personal decisions relating to procreation and contraception. In *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029 (1972), the Supreme Court extended the right to use contraceptives to unmarried persons. There, the Court said:

"If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt,* 405 U.S. at 453, 92 S.Ct. at 1038 (emphasis in original) (citations omitted).

Similarly in *Carey v. Population Services International,* 431 U.S. 678, 97 S. Ct. 2010 (1977), the Supreme Court extended the right to use contraceptives to minors. There, the Court explicitly reiterated that the constitutional right to privacy includes not only an adult's but also a minor's right to determine whether to procreate or prevent conception. The Court said:

"The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices.

. . .

"Of particular significance to the decision of this case, the right to privacy in connection with decisions affecting procreation extends to minors as well as to adults." *Carey,* 431 U.S. at 685, 693, 97 S.Ct. at 2016, 2020.

Thus, the Supreme Court established that minors as well as adults have a constitutionally protected right to privacy that includes both the fundamental right to procreate established in *Skinner* and the fundamental right to prevent conception recognized in *Griswold* and *Eisenstadt,* and, therefore, that there is a constitutionally protected right to individual control over procreation decisions.

In *Roe v. Wade,* 410 U.S. 113, 162-65, 93 S.Ct. 705, 731-32 (1973), the Supreme Court held that the state could not interfere with an adult's right to abortion during the first trimester of pregnancy. Thus, the Supreme Court established that the constitutionally protected right to privacy includes the right to make personal decisions relating to procreation even after conception.

Subsequently, the Supreme Court extended the right to abortion to minors. *H.L. v. Matheson,* 450 U.S. 398, 411, 101 S.Ct. 1164, 1172 (1981); *Bellotti v. Baird,* 443 U.S. 622, 651, 99 S.Ct. 3035, 3052 (1979); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843 (1976). In *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831 (1976), the Supreme Court held that a minor had a constitutionally protected right to obtain an abortion during the first trimester of pregnancy without her parents' consent. Recognizing that "minors, as well as adults, are protected by the Constitution and possess constitutional rights," the Court said:

> "Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." *Danforth,* 428 U.S. at 74, 96 S.Ct. at 2843.

Thus, the Supreme Court established that only the minor, in consultation with her physician, had the right to make procreation decisions concerning herself, and that the minor's determination was not subject to veto by the state or any other third party.

A review of the recent cases demonstrates that without deviation, the Supreme Court has protected the rights of adults and minors to decide for themselves both before and after conception whether to bear children. I recognize that the Supreme Court has not yet defined the full scope of the right to privacy and has not yet determined whether there is a constitutionally protected right to sterilization. Yet, in my view, the rationale underlying the Supreme Court's procreation, contraception, and abortion cases inevitably leads to the conclusion that adults and minors have the fundamental right not only to decide to bear children but also to decide not to bear children, and to make that decision permanent by voluntarily undergoing sterilization. Courts

in other jurisdictions agree. *E.g., Hathaway v. Worcester,* 475 F.2d 701, 705 (1st Cir. 1973); *Ruby v. Massey,* 452 F.Supp. 361, 366, 368 (D. Conn. 1978); *Peck v. Califano,* 454 F.Supp. 484, 486-87 (C.D.Utah 1977); *In re A. W.,* Colo., 637 P.2d 366, 369 (1981); *In re Moe,* 385 Mass. 555, 432 N.E.2d 712, 719-20 (1982); *In re Grady,* 85 N.J. 235, 247, 426 A.2d 467, 473 (1981).

Manifestly, the procreation alternatives available to competent adults and minors should also extend to individuals who are not mentally competent to make the choice themselves. The inability of incompetent individuals to choose should not result in the loss of their constitutionally protected rights. I agree with courts in those states that have determined that a trial court should substitute its judgment for that of the incompetent minor in order to preserve the fundamental rights of the incompetent minor and, therefore, to accord maximum protection to the incompetent minor's best interests.

The rationale underlying the doctrine of substituted judgment was recently expressed by the Supreme Judicial Court of Massachusetts in *In re Moe,* 385 Mass. 555, 432 N.E.2d 712 (1982). There, the Court said:

> "In utilizing the doctrine of substituted judgment, this court seeks to maintain the integrity of the incompetent person by giving the individual a forum in which his or her rights may be exercised. The court dons 'the mental mantle of the incompetent' and substitutes itself as nearly as possible for the individual in the decision making process. In utilizing the doctrine the *court does not decide what is necessarily the best decision but rather what decision would be made by the incompetent person if he or she were competent.*
>
> . . .
>
> To speak solely in terms of the 'best interests' of the ward, or of the State's interest, is to obscure the fundamental issue: Is the State to impose a solution on an incompetent based on external criteria, or is

> it to seek to protect and implement the individual's personal rights and integrity? We reject the former possibility. Each approach has its own difficulties, but the use of the doctrine of substituted judgment promotes best the interests of the individual, no matter how difficult the task involved may be." *In re Moe,* Mass., 432 N.E.2d at 720 (citations omitted) (emphasis added).

Thus, under the doctrine of substituted judgment, in determining whether to authorize sterilization, the trial court must not be concerned solely with objective criteria of what is in the best interests of the incompetent minor, but rather must place primary emphasis upon the decision that would be made by the incompetent minor if he or she were competent. Only by so doing can the incompetent minor's personal fundamental rights be fully protected and, therefore, the incompetent minor's best interests be fully preserved.

The difficulty inherent in the majority's establishment of "medical necessity" as a controlling factor in determining whether to authorize sterilization is that a trial court is compelled to place primary emphasis on a single objective standard irrespective of the decision that the incompetent minor would make if he or she were competent. In my view, treating medical necessity as a controlling factor results in an unacceptable degree of interference with an incompetent minor's right to make decisions concerning sterilization because such a controlling factor might well prevent an individual who would wish to be sterilized if competent from being sterilized.

A minor's constitutionally protected right to decide not to bear a child is to be made by the minor in consultation with her physician and is not subject to veto by the state or any third party. *Danforth,* 428 U.S. at 74, 96 S.Ct. at 2843. A competent minor, in consultation with her physician, may elect a procreative choice that is not a medical necessity. Such a choice is unavailable to an incompetent minor under the standard of medical necessity established by the major-

ity because not even the trial court, substituting its judgment for that of the incompetent minor, can authorize a sterilization that is not a medical necessity. Under the standard established by the majority, a decision to be sterilized that cannot be made by the incompetent minor in consultation with her physician also cannot be made for her by the trial court in consultation with her physician, but rather is made for her solely by her physician on the basis of medical necessity. In essence, under the medical necessity standard, the physician is accorded an absolute veto over the decision to be sterilized. All of the other factors considered by the trial court are irrelevant.

In my view, the majority's medical necessity standard substantially interferes with the protection of an incompetent minor's fundamental rights, and thus the best interests of the incompetent minor are not fully protected. Of the six states that have established factors to be considered in determining whether to authorize the sterilization of an incompetent minor, only one, Colorado, has determined that medical necessity is a controlling factor. *In re A. W.*, Colo., 637 P.2d at 375. Courts in two jurisdictions have explicitly rejected the notion that necessity be regarded as a controlling factor. *In re Moe*, 385 Mass. at n.10, 432 N.E.2d at 722 n.10; *In re Grady*, 85 N.J. at 263 & 263 n.9, 426 A.2d at 481 & 481-82 n.9.

I am persuaded that the rights of an incompetent minor to make a free choice concerning procreation is most effectively protected if medical necessity for sterilization is regarded as but one factor to be considered in determining what is in the best interests of the incompetent minor. Accordingly, to this extent I respectfully dissent.

Finally, even if I were to assume that the standards established by the majority were appropriate, I would not agree with the majority's affirmance in this case. The majority holds that the trial court erred in applying the "demonstrated need" formulation contained in Maryland Code (1974, 1981 Cum. Supp.) § 13-708 of the Estates and Trusts Article, and for the first time establishes appropriate stan-

dards to be employed by trial courts in determining when to authorize the sterilization of an incompetent minor. Nevertheless, the majority chooses not to remand this case to the trial court for the purpose of allowing the parties to present additional evidence required by the newly enunciated standards and for the purpose of allowing the trial court to apply those standards in making the requisite findings. Under these circumstances, the majority's action in affirming rather than reversing and remanding does not comport with my sense of fairness. Thus, even if I agreed with the majority in all other respects, I would reverse and remand for further proceedings in order to advance the purposes of justice. Md. Rule 871. Accordingly, I respectfully dissent.